JONES, APPELLEE, *v.* FRANKLIN COUNTY SHERIFF, APPELLANT.

[Cite as Jones *v.* Franklin Cty. Sheriff (1990), 52 Ohio St. 3d 40.]

(No. 89-125—Submitted January 24, 1990—Decided June 20, 1990.)

*Terry D. Van Horn,* for appellee.

*S. Michael Miller,* prosecuting attorney, *Donald M. Collins* and *William J. Owen,* for appellant.

WRIGHT, J. This case raises two issues. First, is a police officer guilty of conduct unbecoming an officer while off duty when he or she is a party to what amounts to vigilante activity which is clearly outside the scope of her official job duties? Second, must a police officer answer questions that relate specifically and narrowly to the performance of her official duties when the questions are asked in an Internal Affairs Division hearing and when the officer is guaranteed that the answers cannot be used against her in any subsequent criminal prosecution?

We answer both questions in the affirmative. For the reasons stated below, we reverse the court of appeals and reinstate the ruling of the common pleas court affirming appellee's removal of Jones as a deputy sheriff.

I

One of the most serious disciplinary charges that the Franklin County Sheriff brought against Deputy Jones was for conduct unbecoming an officer in participating in the January 9, 1986 search for Matfield's stolen purse. Franklin County Sheriff's Department Reg. 102.40.1 applies to this charge:

"Conduct unbecoming department personnel will include that which brings the department into disrepute or reflects discredit upon the individual as a member of the department, or

that which impairs the operation or efficiency of the department or the individual."

After conducting a full evidentiary hearing, the ALJ concluded in his eighteen-page report and recommendation that the sheriff's department had established by greater than a preponderance of the evidence that Jones's conduct on January 9, 1986 was unbecoming a deputy sheriff. The ALJ determined that Jones's "* * * callous disregard for proper policy procedures; her assistance to her sister in taking the law into their own hands in an attempt to get a purse back; and her failure to take any of the many opportunities to stop her sister from continuing in this course of conduct reflects badly upon herself and the Sheriff's Department."

The court of appeals was correct in stating the general rule that the SPBR has the authority to modify the judgment of an appointing authority where it acts arbitrarily, unreasonably, or unlawfully or where its decision is improper or unnecessary. See R.C. 124.34; *State, ex rel. Ogan,* v. *Teater* (1978), 54 Ohio St. 2d 235, 8 O.O. 3d 217, 375 N.E. 2d 1233. However, we have also held "* * * that due deference must be accorded to the findings and recommendation of the referee * * *, especially where there exist evidentiary conflicts, because it is the referee who is best able to observe the demeanor of the witnesses and weigh their credibility. See, generally, * * * *Seasons Coal Co.* v. *Cleveland* (1984), 10 Ohio St. 3d 77, 10 OBR 408, 461 N.E. 2d 1273." *Graziano* v. *Amherst Exempted Village Bd. of Edn.* (1987), 32 Ohio St. 3d 289, 293, 513 N.E. 2d 282, 285, followed in *Aldridge* v. *Huntington Local Dist. Bd. of Edn.* (1988), 38 Ohio St. 3d 154, 157, 527 N.E. 2d 291, 293. In this particular instance, the SPBR stated that it based its rejection of the ALJ's recommenda-

tion to remove Jones on its review of the ALJ's "Report and Recommendation," with no mention of the record. After a more extensive "review of the entire record," Judge Thompson found the SPBR's decision to be "* * * inconsistent with the evidence presented to the hearing officer * * *." The due deference standard enunciated in *Graziano, supra,* requires the reviewing authority to conduct this more extensive review of the entire record. *Aldridge, supra,* at 158, 527 N.E. 2d at 294. Because Judge Thompson's review and decision are in accord with our holding in *Graziano, supra,* we reinstate the trial court's decision.

As the common pleas court correctly stated, it is settled public policy "* * * that police officers are held to a higher standard of conduct than the general public." See *In re Bronkar* (1977), 53 Ohio Misc. 13, 7 O.O. 3d 261, 372 N.E. 2d 1345; *Kelley* v. *Johnson* (1976), 425 U.S. 238. Law enforcement officials carry upon their shoulders the cloak of authority of the state. For them to command the respect of the public, it is necessary then for these officers even when off duty to comport themselves in a manner that brings credit, not disrespect, upon their department. Since a fair-minded review of the entire record indisputably reveals that Deputy Jones's vigilante activities could not bring anything but disrepute upon the sheriff's department, Judge Thompson was correct in reversing the SPBR's order and in affirming the removal of Jones.

II

At the January 14, 1986 IAD interview, Deputy Jones refused to answer questions in an investigation of her conduct. Jones was informed that any evidence or information obtained from the interview could not be used against her in a subsequent criminal pro-

ceeding, pursuant to a sheriff's department policy and collective bargaining agreement, and pursuant to the United States Supreme Court holding in *Garrity* v. *New Jersey* (1967), 385 U.S. 493. See, also, *Lefkowitz* v. *Cunningham* (1977), 431 U.S. 801; *Lefkowitz* . v. *Turley* (1973), 414 U.S. 70; *Gardner* v. *Broderick* (1968), 392 U.S. 273; *Uniformed Sanitation Men Assn., Inc.* v. *Commr. of Sanitation* (1968), 392 U.S. 280.

The United States Supreme Court has consistently held that a public employee may not be forced to choose between making incriminating statements and facing dismissal, since such a choice would effectively negate the Fifth Amendment privilege against self-incrimination. *D'Acquisto* v. *Washington* (N.D. Ill. 1986), 640 F. Supp. 594, 622, citing *Lefkowitz* v. *Cunningham, supra; Gardner* v. *Broderick, supra.* Yet, public employees can be required to answer potentially incriminating questions, so long as they are not asked to surrender their constitutional privilege against self-incrimination. *Lefkowitz* v. *Cunningham, supra,* at 806, citing *Gardner* v. *Broderick, supra,* at 278-279.

The privilege against self-incrimination is preserved because a statement by investigators that nothing said at the hearing can be used at a subsequent criminal proceeding effectively immunizes that testimony from later use by a prosecutor. Since use of these statements by the prosecution is barred, by definition no statement made in the hearing can be incriminatory. Thus, it has been held that the employee must answer these specific, narrowly tailored questions or face a possible dismissal for insubordination. *Gardner* v. *Broderick, supra; Erwin* v. *Price* (C.A.11, 1985), 778 F. 2d 668; *Donohoe* v. *Franklin Cty. Sheriff* (June 7, 1988), Franklin App.

No. 87AP-648, unreported; *Hobbie* v. *Medina* (1985), 29 Ohio App. 3d 306, 29 OBR 405, 505 N.E. 2d 276.

Since both the public and police officers themselves hold the police officer in a position of honor and respect, it is incumbent upon a police officer to keep his or her activities above suspicion both on and off duty. Thus the IAD, within clearly defined constitutional parameters, must be given latitude to conduct investigations to ensure the continued integrity of the department. It is critical to any meaningful IAD investigation that, once officers have been assured that their constitutional guarantees remain intact, they are required to respond to specific questions dealing with job performance. Without such a mandate, the IAD cannot ensure the integrity and trustworthiness of the department's officers and the public cannot be assured of the propriety of placing its trust in these public servants.

Agents of the Federal Bureau of Investigation and members of the bar are under mandates parallel to those governing police officers to answer specific questions in the course of a disciplinary investigation. The United States Court of Appeals has held that an FBI agent is "indisputably obliged to answer all questions truthfully" in an internal affairs investigation after being granted immunity. *United States* v. *Friedrick* (C.A.D.C. 1988), 842 F. 2d 382, 395-396.

Members of the bar of Ohio are similarly required to cooperate with disciplinary authorities "* * * to assist in any investigation or to testify in any hearing before the Board of Commissioners or any panel for which provision is made in this rule * * *." Gov. Bar R. V(5)(a). Just as law enforcement officers, FBI agents, and certain other public employees are required to cooperate in internal disciplinary in-

vestigations, so too members of the bar must not "* * * neglect or refuse so to assist in any such investigation or so to testify." *Id.*

The ALJ had ample evidence before him to find that when Jones refused a direct order to answer, she violated Sheriff's Department Reg. 102.55. This regulation provides in part:

"55. General Requirements

"Department Personnel Will:

"* * *

"F. Carry out such orders and directives as may be given them by superiors * * *."

We hold that the ALJ properly concluded that the appointing authority was justified in finding Jones insubordinate, and that the SPBR's conclusion to the contrary was not supported by substantial evidence.

The trial court reviewed the SPBR order on this question and correctly concluded that as a matter of law, a public employee must answer such questions when the requisite constitutional guarantees are given, and that Jones's refusal to do so constituted insubordination. We hold that the court of appeals erred when it found that Judge Thompson abused his discretion when he reversed the SPBR's decision that Jones was not insubordinate.

The trial court also correctly concluded that Jones's dismissal was warranted under the department's policy of progressive discipline. The sheriff's department had already disciplined Jones six times. In his opinion Judge Thompson noted that Jones's disciplinary record included several written reprimands and a suspension for reasons including failure to follow the direct order of a superior officer.

Thus the court of appeals erred when it found an abuse of discretion by the trial judge. The decision of the

court of appeals is reversed and the decision of the trial court is reinstated.

*Judgment reversed.*

MOYER, C.J., HOLMES, H. BROWN and RESNICK, JJ., concur.

HOLMES, J., concurs separately.

SWEENEY, J., dissents.

DOUGLAS, J., dissents with opinion.

HOLMES, J., concurring. In that the dissent is most desirous of obtaining a result not warranted either by the facts of this case or the appropriate law, I feel compelled to amplify just what this case is about, rather than delve into the constitutional tome contained within the dissent.

Here, as set forth within the findings of fact and conclusions of law of the administrative law judge who considered this matter at length, there were two major violations by this deputy sheriff within the status of her employment with the office of the Sheriff of Franklin County, Ohio.

The administrative law judge specifically set forth within his report that this deputy sheriff had violated Reg. 102.40 relative to officer conduct. Reg. 102.40 states:

"Department personnel will conduct themselves at all times, both on and off duty, in such a manner as to reflect most favorably on the department."

Subsection 40.1 provides:

"Conduct unbecoming department personnel will include that which brings the department into disrepute or reflects discredit upon the individual as a member of the department, or that which impairs the operation or ef-

ficiency of the department or the individual."

The administrative law judge stated that "[i]t is this regulation which appellant has violated. When Lilly White told Appellant that Valerie Matfield had gone to apprehend the person who took her purse, appellant was on actual notice that her sister was about to take the law into her own hands. Appellant did not contact the Police Department. Rather, she joined this vigilante action with her sister. When she got to the car where Traci Smith was being taken out by Valerie Matfield, appellant did not stop her sister and instruct her to contact the police. She did not even tell her sister to take Traci to the Police Department. Rather, appellant said, when asked about this on the stand, 'All my sister wanted was her purse back — that's all I wanted, too.'

"Appellant is a Deputy Sheriff for Franklin County. Notwithstanding her training and her duty, Appellant continued in her participation of this vigilante action by her sister. She followed her sister and Traci to the South 17th Street address. They went into Vivian Brihm's home. She did not, at this point, stop her sister and say, 'We shouldn't be searching someone's residence. That's a job for the police.' She didn't say, 'Now we've got Traci and the purse in one place. Let's call the police.' Rather than do any of this, Appellant permitted this action by Valerie Matfield to continue.

"* * *

"On this issue, the testimony of virtually all of the witnesses agrees. Appellant's conduct was not of the sort which would reflect most favorably on the department. Quite the contrary. Her callous disregard for proper police procedures; her assistance to her sister in taking the law into their own hands in an attempt to get a purse back; and her failure to take any of the many opportunities to stop her sister from continuing in this course of conduct reflects badly upon herself and the Sheriff's Department. Based upon the evidence, I find that Appellee has established, by more than it [sic] required preponderance of the evidence, that Appellant's conduct on January 9, 1986, constitutes conduct unbecoming a Deputy Sheriff.

"Finally, Appellant was removed, at least in part, for her refusal to answer questions during an I.A.B. investigation. Based upon the transcript of the I.A.B. meeting (Joint Exhibit 1), I find that Appellant, through counsel, did indeed refuse a direct order to answer questions in an I.A.B. investigation, after she was told that the matters discussed were not usable in a subsequent criminal proceeding. I further find that at the same time that there was an I.A.B. investigation going on, there was a criminal investigation going on for the same matters being reviewed by I.A.B."

Concerning the finding of the administrative law judge, the State Personnel Board of Review came to the following most unusual conclusion:

"As for the Appellant's conduct constituting behavior unbecoming an officer, it is our conclusion the unusual circumstances surrounding this incident somewhat negate the impropriety of the Appellant's conduct. Although the Appellant probably should have called the police, she just wanted to see her sister get her purse back and took the actions which she felt were necessary in order to accomplish this. If they had not pursued Ms. Smith, it is unlikely the Appellant's sister would have ever gotten her purse."

Judge Tommy Thompson of the trial court, after reviewing all the evidence and materials, concluded:

"In the instant case, the Court finds, upon review of the entire record, that the Board's decision is inconsis-

tent with the evidence presented to the hearing officer which the Court believes aptly demonstrates violations of department regulations, and the charge of insubordination.

"It is now a well accepted principle that police officers are held to a higher standard of conduct than the general public. *In re Bronkar* ([C.P.] 1977)[, 53 Ohio Misc. 13,] 372 N.E. 2d 1345; [*Kelley*] v. *Johnson* (1976), 425 U.S. 238, 96 S. Ct. 1440. The State Personnel Board of Review did not apply the aforementioned standard, nor recognize the appropriate deference that should be afforded departmental regulations. [*Kelley*], *supra*."

The administrative law judge, after a review of all facts and the applicable law relating to the failure of a public employee to answer questions of an appointing authority in a civil departmental hearing, found that: "Based upon the transcript of the I.A.B. meeting (Joint Exhibit 1), I find that Appellant, through counsel, did indeed refuse a direct order to answer questions in an I.A.B. investigation, after she was told that the matters discussed were not usable in a subsequent criminal proceeding. * * *

"* * * The legal question is whether or not an employee may be discharged for refusal to answer questions which relate to the performance of his official duties. After a review of the relevant case law in this matter, and for the reasons set forth below, I conclude that appellant may be appropriately disciplined for her refusal.

"This issue has been previously considered by this Board. Rather than restate all of the cases involving the discipline of employees for refusal to answer questions propounded by their Appointing Authorities, I direct the board's attention to the Report and Recommendation in the case of *Donohoe* v. *Franklin County Sheriff*, 86-REM-06-0995. I especially direct

the Board's attention to the case of *Erwin* v. *Price* (Eleventh Circuit 1985), 778 F. 2d 668."

The trial court concluded that the evidence adduced and the law were supportive of the administrative law judge's position on this issue, and stated within its decision:

"Further the Appellee had no absolute right to keep silent or refuse to answer questions during the departmental inquiry, and the failure of this deputy sheriff to respond to an order of a superior officer constituted insubordination. There is ample precedent to find, as a matter of law, that public employees must answer questions in a civil proceeding when their testimony will not be used to incriminate them in a subsequent criminal investigation, and that refusal to do so is grounds for removal. *Donohoe* v. *Franklin County Sheriff*, 96CV-10-6745, Court of Common Pleas, Franklin County (June 5, 1987[, affirmed (June 7, 1988), Franklin App. No. 87AP-648, unreported]). *Erwin* v. *Price* * * * [*supra*]; and see further, *Gardner* v. *Broderick* (1968), 392 U.S. 273, 88 S. Ct. 1913; *Lefkowitz* v. *Cunningham* (1977), 431 U.S. 801, 97 S. Ct. 2132 (*Lefkowitz II*). Such inquiry may also involve off-duty conduct. *Erwin, supra*."

As to the board of review's disaffirmance of the order of removal, the trial court very pointedly remarked:

"In disaffirming the order of removal by the appointing authority, the Board further disregarded the principle of progressive discipline. *Scott* v. [*Reinier* (1978)], 60 Ohio App. 2d 289. The record reflects that the appellee was disciplined on six previous occasions for a variety of charges prior to the instant case including a previous failure on the part of the Appellee to follow a direct order. The Appellee had previously received several written reprimands, and a suspension.

"It is apparent that the present Sheriff, and his predecessor, had adhered to the principle of progressive discipline. Thus, the Board's conclusion that removal was too harsh, and that a written reprimand should be imposed, is not supported by the record."

The trial court here, an experienced judge of the Court of Common Pleas of Franklin County, well understood the standard of review of a determination of the State Personnel Board of Review. He knew, and so stated, that he may not substitute his opinion for that of the board, and that the order of the board must be upheld if it is supported by reliable, probative and substantial evidence and is in accordance with law. Knowing the elements of this standard, Judge Thompson very appropriately found that the order of the State Personnel Board of Review disaffirming the removal of deputy sheriff Diane Jones was not supported by reliable, probative and substantial evidence, and was contrary to law.

Abuse of discretion connotes more than an error in judgment. It implies a decision without a reasonable basis, one which is clearly wrong. *Angelkovski* v. *Buckeye Potato Chips Co.* (1983), 11 Ohio App. 3d 159, 161-162, 11 OBR 242, 244, 463 N.E. 2d 1280, 1283. Decisions of this court, and R.C. 119.12, empower the court of common pleas to thoroughly review the decisions of administrative agencies, and reverse those decisions not supported by the requisite quantum of evidence. The record does not demonstrate that the common pleas court, in exercising its statutory power, abused its discretion in reviewing the decision of the board of review. It is, to the contrary, evident the court carefully weighed the evidence, questions of law, and those factors that prompted the appointing authority to remove deputy Jones. The decision of the board, in the face of an eighteen-page report and recommen-dation by the administrative law judge, does not mirror such an analysis. Indeed, the board abused its discretion here.

Concluding, I find that consistent prior discipline of a public employee raises the presumption that removal, while harsh, is proper, particularly under the circumstances herein. As pronounced by the United States Supreme Court, a law enforcement officer must be required to adhere to a higher standard of conduct, and the rules and regulations of a law enforcement agency, herein the Franklin County Sheriff's office, must be afforded due deference. *Kelley* v. *Johnson* (1976), 425 U.S. 238.

The majority's opinion here, rather than being what the dissent oddly categorizes as an act of police bashing, is to the contrary a solid stroke in support of a law enforcement officer — the Sheriff of Franklin County, and the proper administration of the sheriff's department of that county.

DOUGLAS, J., dissenting. Because the majority opinion contains a number of rather remarkable statements that, I believe, cannot withstand scrutiny, I respectfully, but vigorously, dissent. In addition, I write because it is hard for me to believe that the court of last resort in this state — a court whose sworn obligation it is to protect the constitutional rights of citizens — can fail so miserably when put to the test. I comment on only a few of the most troubling comments and conclusions of the majority.

I begin with the majority's statement that "* * * public employees can be required to answer potentially incriminating questions, so long as they are not asked to surrender their constitutional privilege against self-incrimination. * * *" That statement, in and of itself, is internally contradictory. Giving the majority the best of it,

apparently what is meant is that public employees, *after being properly immunized,* can be required to answer questions that might incriminate them and lead to criminal prosecution, absent proper immunization. If that is what the majority really means, then the majority should say so because that is the law for all citizens — not just public employees.

But I fear that is not what the majority means, given the facts of this case. As will be discussed *infra,* Officer Jones was not "immunized," because the proper procedure for granting immunity was not followed. Thus, the majority opinion leaves the law in the state that *all* public employees can be required to incriminate themselves — or lose their jobs — a likely result in any event if they do in fact incriminate themselves.

I recognize that public-employee bashing is fashionable. What some members of the majority have against public employees in general — and police officers and fire fighters in particular (see *Rocky River* v. *State Emp. Relations Bd.* [1988], 39 Ohio St. 3d 196, 530 N.E. 2d 1, vacated on reconsideration [1989], 43 Ohio St. 3d 1, 539 N.E. 2d 103; see, also, *State, ex rel. Clark,* v. *Greater Cleveland Regional Transit Auth.* [1990], 48 Ohio St. 3d 19, 548 N.E. 2d 940; *Hamilton Cty. Bd. of Mental Retardation & Developmental Disabilities* v. *Professionals Guild of Ohio* [1989], 46 Ohio St. 3d 147, 545 N.E. 2d 1260; *Lorain City Bd. of Edn.* v. *State Emp. Relations Bd.* [1988], 40 Ohio St. 3d 257, 533 N.E. 2d 264; *South Community, Inc.* v. *State Emp. Relations Bd.* [1988], 38 Ohio St. 3d 224, 527 N.E. 2d 864; *Central Ohio Transit Auth.* v. *Transport Workers Union of America, Local 208* [1988], 37 Ohio St. 3d 56, 524 N.E. 2d 151) — is difficult to understand, but to now take away such persons' Fifth Amendment rights is impossible to comprehend. While public employees should not be accorded "favored status," neither should they be made second-class citizens. Yet, today, the majority does just that by according to public employees less constitutional protection than other citizens enjoy.

In answer to the Fifth Amendment argument, the majority contends that "[t]he privilege against self-incrimination is preserved because a statement by investigators that nothing said at the hearing can be used at a subsequent criminal proceeding effectively immunizes that testimony from later use by a prosecutor. * * *" If that statement of law was not so serious, yea astounding, it would be laughable.

Broken down to its simplest terms, this statement says that police investigators, investigating another police officer for suspected criminal activity, can in effect accord the suspected officer (a public employee) absolution for whatever criminal activity has occurred and has been admitted to investigators. Further, the majority then binds prosecutors from ever using such information in any criminal proceeding. In short, we are placing in the hands of those who are charged with the responsibility of enforcing the law the right to forgive those who may have broken the law. This cozy little deal may seem to make sense to the majority but I submit that the price the majority is paying to achieve its predetermined result (to fire Officer Jones) is just too high.

The majority's result sanctions official lawlessness — lawlessness of the worst sort since the very people engaging in it are those whom we depend upon to enforce the law. If we permit this, who will watch the watchman?

Further, to support its position, the majority says that "Jones was informed that any evidence or information obtained from the interview could

not be used against her in a subsequent criminal proceeding * * *." Later in the opinion, the majority equates this to an FBI agent being required to answer questions truthfully "* * * in an internal affairs investigation *after being granted immunity.* * * *" (Emphasis added.)

The majority states the law right — "after being granted immunity." The problem here is, however, that Officer Jones was not given immunity despite what the majority says or believes. Immunity from prosecution cannot be given by police officers or even prosecutors. In the criminal justice system, immunity can be granted only by judges after certain mandated procedures are followed. Any good lawyer accompanying a targeted person to an internal affairs investigation hearing would know that immunity could not be lawfully given by investigators. Even if such a course of action were lawful, only a naive person would accept that the information revealed would not be used to provoke an independent investigation of the suspected officer while, all the time, it would be maintained that the officer's actual statements were not being used against the officer.

Can any of us, with a straight face, really argue that if an officer, in an internal affairs investigation, after being given "immunity" by an investigating officer, admits to having committed a crime and that information comes into the hands of the county prosecutor or a judge of the county, that the prosecutor or judge would not see to it that the officer is prosecuted? To accept that proposition would be to accept that such officials would breach their sworn duty. I· am not prepared to accept such a proposition.

Just as grievous as the foregoing is the citation of authority by the majority. The majority cites several cases to support its conclusion that Officer Jones could properly be discharged for exercising her Fifth Amendment privilege against self-incrimination. Specifically, the majority cites *Garrity* v. *New Jersey* (1967), 385 U.S. 493; *Gardner* v. *Broderick* (1968), 392 U.S. 273; *Uniformed Sanitation Men Assn., Inc.* v. *Commr. of Sanitation* (1968), 392 U.S. 280; *Lefkowitz* v. *Turley* (1973), 414 U.S. 70; and *Lefkowitz* v. *Cunningham* (1977), 431 U.S. 801. My concern is that these cases not only do *not* support the majority's position but, rather, support the conclusion that dismissing Officer Jones for her failure to answer potentially incriminating questions clearly violated her Fifth Amendment privilege against self-incrimination. Therefore, Officer Jones could not be dismissed on that basis. A thorough review of these cases illustrates how today's majority opinion runs afoul of the United States Supreme Court's pronouncement on the issue presented by this appeal.

In *Garrity, supra,* the Supreme Court of New Jersey ordered the attorney general to investigate alleged irregularities occurring in the municipal courts. During the investigation, police officers were questioned regarding the alleged irregularities. Before questioning, each ·officer was warned that anything the officer said could be used against him or her, that the officer had the privilege to refuse to answer questions, but that if the officer refused to answer questions, the officer would be subject to removal from office. (A New Jersey statute provided for the removal of a public employee if the employee refused to answer the inquiry.)

The police officers answered the questions although the officers received *no grant of immunity* because *no* immunity *statute* was applicable under the circumstances. Answers of some of the officers were subsequently

used against them in securing their criminal convictions.

Based upon these facts, the United States Supreme Court concluded that the statements obtained from the officers were coerced under threat of removal from office. Therefore, the statements could not be used against the officers in a subsequent criminal prosecution. *Id.* at 500.

Thus, *Garrity* stands for the proposition that if a public employee is forced to choose between answering questions when the answers may incriminate him on the one hand, and forfeiting his job for failure to answer on the other hand, any statements by the employee are not voluntary and cannot be used against him or her in a subsequent criminal prosecution.

In *Gardner, supra,* a police officer was called to appear before a New York County grand jury investigating alleged bribery and corruption of police officers. The officer was advised of his privilege against self-incrimination. At the time in question, the Charter of the City of New York provided for the termination of a public employee if the employee failed to waive immunity from prosecution. Since the officer was called to testify before the grand jury, and a grand jury witness is provided immunity from prosecution under New York law,[2] the officer was asked to waive the immunity from prosecution or be terminated for failure to do so. The officer refused to sign the waiver of immunity and was discharged.

In *Gardner,* the issue before the court was whether a state may discharge an officer for refusing to waive the privilege against self-incrimination. *Id.* at 277. In addressing this issue, the court stated that:

"* * * If appellant, a policeman, had refused to answer questions specifically, directly, and narrowly relating to the performance of his official duties, *without being required to waive his immunity with respect to the use of his answers* or the fruits thereof in a criminal prosecution of himself * * * the privilege against self-incrimination would not have been a bar to his dismissal.

"The facts of this case, however, do not present this issue. Here, petitioner was summoned to testify before a grand jury in an investigation of alleged criminal conduct. He was discharged from office, not for failure to answer relevant questions about his official duties, but for refusal to waive a constitutional right. He was dismissed for failure to relinquish the protections of the privilege against self-incrimination. * * *" (Emphasis added; footnote omitted.) *Id.* at 278.

The court reached the conclusion that the officer could not constitutionally be dismissed for failing to *waive* the statutory grant of *immunity. Id.* at 279. In doing so, the Supreme Court recognized that a public employee could properly be dismissed for failing to answer certain questions *if* the employee was not required to waive immunity from use of his answers, *i.e.,* if the employee had immunity during questioning.

Therefore, *Gardner* stands for the proposition that dismissing a public

---

[2] Between 1953 and 1971, grand juries were authorized by statute to grant immunity under New York law. See former Penal Law Section 2447 (L. 1953, Chapter 891, eff. Sept. 1, 1953); N.Y. Session Laws Section 619-c, Chapter 681 (McKinney 1967). Since 1971, grand jury witnesses have been provided automatic immunity under New York law. N.Y. Consol. Laws Ann., Criminal Procedure, Section 190.40 (L. 1970, Section 190.40, Chapter 996, eff. Sept. 1, 1971).

employee because the employee asserts the privilege against self-incrimination is constitutionally impermissible unless the employee is *granted immunity* (without being required to waive it once granted) so that any statements cannot be used against the employee for purposes of securing a criminal conviction.

*Sanitation Men, supra,* and *Gardner* were companion cases involving the same substantial question. In *Sanitation Men,* public employees were summoned to testify before a properly authorized investigating officer. Each employee was advised that in accordance with the Charter of the City of New York (the same charter referred to in *Gardner*), he could be dismissed for failing to testify. Some of the employees asserted their Fifth Amendment privilege and were dismissed for failing to answer the questions. Some other employees answered the questions but refused to sign waivers of immunity when summoned before the grand jury. (As in *Gardner,* immunity was granted by statute.)[3] These employees were dismissed for failure to waive immunity.

Relying on *Gardner,* the United States Supreme Court clearly and unambiguously held that the employees were faced with a choice between surrendering their constitutional rights or their jobs and that is constitutionally impermissible. However, if the employees were compelled to answer certain questions *without surrendering* their constitutional rights, dismissal would be appropriate. *Id.* at 284-285.

Therefore, *Sanitation Men* and *Gardner* clearly hold that in the absence of an effective grant of immunity, or when an employee is required to waive immunity which was once properly granted, public employees cannot be dismissed for invoking their Fifth Amendment privileges. If immunity is properly granted, employees can be required to answer certain questions, or be terminated for failing to do so, because the danger of self-incrimination is not present if the statements obtained are immunized.

In *Turley, supra,* two architects licensed by the state of New York were summoned before a grand jury. Grand jury witnesses were granted immunity under New York law.[4] New York law also required public contracts to provide that if a contractor refused to waive immunity or answer questions in some situations, his existing contracts could be cancelled and the contractor disqualified from further transactions with the state for a specified period of time. The architects refused to waive immunity and then alleged that their present and future contracting privileges were threatened as a result of their having exercised their Fifth Amendment privilege.

Relying on *Garrity, Gardner* and *Sanitation Men,* the United States Supreme Court stated:

"We should make clear, however, what we have said before. Although due regard for the Fifth Amendment forbids the State to compel incriminating answers from its employees and contractors that may be used against them in criminal proceedings, the Constitution permits that very testimony to be compelled *if neither it nor its fruits are available for such use.* * * * Furthermore, the accommodation between the interest of the State and the Fifth Amendment requires that the State have means at its disposal to secure testimony *if immunity is supplied* and testimony is still refused. This is recognized by the

---

[3] See fn. 2, *supra.*

[4] See fn. 2, *supra.*

power of the courts to compel testimony, *after a grant of immunity,* by use of civil contempt and coerced imprisonment. * * * Also, given *adequate immunity,* the State may plainly insist that employees either answer questions under oath about the performance of their job or suffer the loss of employment. By like token, the State may insist that the architects involved in this case either respond to relevant inquiries about the performance of their contracts or suffer cancellation of current relationships and disqualification from contracting with public agencies for an appropriate time in the future. But the State may not insist that appellees waive their Fifth Amendment privilege against self-incrimination and consent to the use of the fruits of the interrogation in any later proceedings brought against them. Rather, the State must recognize what our cases hold: that answers elicited upon the threat of the loss of employment are compelled and inadmissible in evidence. Hence, if answers are to be required in such circumstances *States must offer to the witness whatever immunity is required to supplant the privilege and may not insist that the employee or contractor waive such immunity.*" (Emphasis added.) *Turley, supra,* at 84-85.

The preceding paragraph could not be more clear! Likewise, *Cunningham, supra,* also explicitly states that the "* * * government cannot penalize assertion of the constitutional privilege against compelled self-incrimination by imposing sanctions to compel testimony which has not been immunized." *Id.* at 806.

Today's majority has misinterpreted *Garrity* and its progeny and thus condones compelled incriminating answers to be given by *all* public employees without the grant of adequate immunity, or any immunity at all.

The Ohio Revised Code provides that immunity may be granted in certain limited circumstances and only upon compliance with the proper procedures (none of which is applicable in the case at bar). For example, R.C. 2945.44 provides in relevant part:

"(A) In any criminal proceeding in this state or in any criminal or civil proceeding brought pursuant to sections 2923.31 to 2923.36 of the Revised Code, if a witness refuses to answer or produce information on the basis of his privilege against self-incrimination, *the court of common pleas* of the county in which the proceeding is being held, unless it finds that to do so would not further the administration of justice, *shall compel the witness to answer* or produce the information, *if both of the following apply*:

"(1) *The prosecuting attorney* of the county in which the proceedings are being held *makes a written request to the court of common pleas* to order the witness to answer or produce the information, notwithstanding his claim of privilege;

"(2) *The court of common pleas informs the witness* that by answering, or producing the information he will receive immunity under division (B) of this section.

"(B) If, but for this section, the witness would have been privileged to withhold an answer or any information given in any criminal proceeding, and he complies with an order under division (A) of this section compelling him to give an answer or produce any information, he shall not be prosecuted or subjected to any criminal penalty in the courts of this state for or on account of any transaction or matter concerning which, in compliance with the order, he gave an answer or produced any information." (Emphasis added.)

Pursuant to R.C. 2945.44, a court of common pleas is empowered to

grant immunity to witnesses. Sheriff's sergeants are not!

Further,[5] R.C. 2939.17 provides that a judge of the court of common pleas must grant immunity to a witness in a special grand jury proceeding upon proper written request of the Attorney General when the Attorney General has been directed to conduct an investigation or prosecution. Nowhere in R.C. 2939.17 are sheriff's sergeants mentioned!

In the case at bar, the majority properly states that a police officer must answer questions that relate specifically and narrowly to the performance of her official duties when questions are asked in an internal affairs investigation *if* the officer is *guaranteed* that the answers cannot be used against her in a subsequent criminal prosecution. This statement is obviously supported by the decisions of the United States Supreme Court that I have just reviewed. However, the majority errs in concluding that Jones was *guaranteed* that her answers could not be used against her. No guarantee in the form of immunity from prosecution could be given under the circumstances absent compliance with an immunity statute. As such, Jones's dismissal premised upon the exercise of her Fifth Amendment privilege against self-incrimination is constitutionally repugnant.

The majority also relies upon *United States* v. *Friedrick* (C.A.D.C. 1988), 842 F. 2d 382, to support its position. However, *Friedrick* does not deal with the issue before us concerning whether an employee may be discharged for invoking her Fifth Amendment privilege. Additionally,

the majority fails to state that the employee in *Friedrick* was *granted immunity* as a potential grand jury witness.

Further, the majority relies on *Donohoe* v. *Franklin Cty. Sheriff* (June 7, 1988), Franklin App. No. 87AP-648, unreported. In *Donohoe*, an employee refused to answer questions which *could not* incriminate the employee. The majority also cites *Erwin* v. *Price* (C.A. 11, 1985), 778 F. 2d 668, and *Hobbie* v. *Medina* (1985), 29 Ohio App. 3d 306, 29 OBR 405, 505 N.E. 2d 276. *Erwin* and *Hobbie* rely upon *Garrity* and its progeny and reach an erroneous result as does today's majority. In any event, I fail to understand why the majority of this court relies upon federal and state appellate court opinions when the United States Supreme Court has decided the issue in question.

The majority apparently concludes that under *Garrity*, Jones was "guaranteed" that her statements could not be used against her because, of course, using the coerced statements in a criminal prosecution is unconstitutional. In doing so, the majority ignores the Supreme Court authority requiring that adequate *immunity* be granted *before* an employee can be discharged for refusing to answer questions. No immunity was granted and, hence, Jones's dismissal was improper.

Assuming that we are willing to accept the majority's rationale, however indefensible its position may be, I am still compelled to dissent from the majority's opinion for several additional reasons. If public employees are to answer questions or lose their jobs for

---

[5] Other statutes which provide for the grant of immunity are contained throughout the Revised Code. See, *e.g.*, R.C. 101.44 (witnesses called before the General Assembly). However, no statute empowers sheriff's sergeants to confer immunity.

failure to do so, any statement made by an employee cannot be used against him or her in a subsequent criminal prosecution. *Garrity, supra.* Accepting this, should public officers be permitted in effect to absolve other public officers from any misdeed so as to deprive the state of Ohio from enforcing its laws? For example, if a public officer requires a public employee to answer questions regarding an alleged murder (or be fired for failing to answer), and the murder is admitted, the admitted murderer could go free. He could in practice be absolved of a crime with no criminal accountability to follow for this public employee's lawlessness. While the majority may be able to accept this, I cannot!

Not only does the majority opinion sanction the violation of Jones's rights, but today's decision sanctions the violation of *every* public employee's rights, including teachers, fire fighters and transportation workers, to name only a few. The majority also apparently stands ready to sanction the violation of attorneys' constitutional rights. Where in the Fifth Amendment is there any provision that exempts from its protections public employees and members of the bar? In *Garrity*, the United States Supreme Court held that "* * * policemen, like teachers and lawyers, are not relegated to a watered-down version of constitutional rights." *Id.* at 500. Accordingly, today's majority has clearly erred and appears ready to continue to do so.

In *Spevack* v. *Klein* (1967), 385 U.S. 511, the United States Supreme Court held that the Self-Incrimination Clause of the Fifth Amendment extends its protections to attorneys and should not be watered down by imposing penalties (such as disbarment) as a price for asserting it. *Id.* at 514. The court concluded that the attorney could not be disbarred for asserting

the privilege. *Id.* at 518-519. Therefore, even the majority's analogy between the case at bar and situations involving attorney discipline fails to support its position but, rather, supports the position of this dissent. *Spevack* is conspicuously absent from the majority opinion.

Finally, as a housekeeping matter I believe that the way the "facts" in the case at bar have been presented warrants some consideration. Normally, preceding the opinion of the court, we set forth a statement of fact supported by the record. In this section, we normally do not supplant facts with conclusions. However, the majority's opinion in the present case has made several conclusions, representing those conclusions to be factual in nature.

Even worse than injecting conclusions into the statement of "fact" is what the majority has failed to include in the "facts." Jones was afforded a *pre*disciplinary hearing on February *11*, 1986. On February *12*, 1986, the sheriff wrote to Jones stating that, "[a]s a result of your pre-disciplinary hearing * * * I have decided to remove you from your position * * *." (Emphasis added.) The removal order was also filed on February 12, 1986. However, the removal order was signed February *4*, 1986, a full week *prior* to the predisciplinary hearing. As such, the decision to discharge was apparently made before Jones had an opportunity to be heard. Further, the order of removal did not even specify the charge of insubordination for failure to answer questions. As a result, Jones was discharged without her being given adequate notice of all the charges against her. The majority also fails to state that Jones had learned that criminal charges had been filed against her and that she was to be arrested following the internal affairs

interview. In fact, Jones was arrested the same day that the internal affairs investigation ended. Even more interesting is that, as alleged by appellee and not denied by appellant, Jones was acquitted of all criminal charges by a jury of twelve. In my judgment, this leads to the inescapable conclusion that anything Jones said would have been used against her in trying to secure a criminal conviction of Jones.

Finally, the majority states that Jones was found to have violated Reg. 102.55. However, the ALJ did *not* specifically find that Jones violated Reg. 102.55 as that regulation is general, as opposed to specific in nature.

Today's majority opinion is not only unsupported by legal authority, but runs afoul of every major pronouncement on the issue of Fifth Amendment privilege. The majority has taken an indefensible legal position in the issue before us and has attempted to support its position in an unprecedented fashion in order to reach, I fear, a predetermined result.

The sad part of all this is that there is no necessity to violate an officer's (or any public employee's) Fifth Amendment right to accommodate a public employer's need to remove an employee, suspected of criminal activity, from active service. All that need be done is to place the employee on suspension (with or without pay), proceed with an investigation and then prove the allegations as in any other criminal case without the coerced testimony of the accused. To preserve precious constitutional rights, is this asking too much? Hardly — and it makes no difference that there might be a provision in a collective bargaining agreement requiring coerced testimony. An unconstitutional provision is unconstitutional wherever it may be found.

It is not good enough that "the end justifies the means." When contemplating this, we should be ever mindful of the words of Justice Brandeis found in his dissent in *Olmstead* v. *United States* (1928), 277 U.S. 438, 479, where he admonished that: "[I]t is * * * immaterial that the intrusion was in aid of law enforcement. Experience should teach us to be most on our guard to protect liberty when the government's purposes are beneficent. Men born to freedom are naturally alert to repel invasion of their liberty by evil-minded rulers. The greatest dangers to liberty lurk in insidious encroachment by men of zeal, well-meaning but without understanding."

It is my judgment that in a society which prides itself on being based upon law rather than might, the governors, as well as the governed, must obey the law.

For all the foregoing reasons, I am compelled to respectfully dissent.