DECISION.
{¶ 1} Plaintiff-appellee, the city of Cincinnati, fired Cincinnati Police Officer Victor Spellen following his admission that he had lied under oath while testifying during the criminal jury trial of a fellow police officer. An arbitrator appointed pursuant to the collective-bargaining agreement between the city and defendant-appellant, Queen City Lodge No. 69, Fraternal Order of Police (hereinafter, "FOP"), sustained the grievance filed by the FOP on Spellen's behalf. The arbitrator ordered that Spellen be reinstated and that his termination be reduced to a three-day suspension.
 {¶ 2} The city filed a motion to vacate the arbitrator's award in the Hamilton County Court of Common Pleas, pursuant to R.C. 2711.10. The FOP filed a motion to confirm the award, pursuant to R.C. 2711.09. The common pleas court granted the city's motion to vacate the arbitrator's award and denied the FOP's motion to confirm the award. The FOP now appeals.
 Spellen Lied Under Oath {¶ 3} The following facts were adduced at the arbitration hearing. Following Spellen's swearing-in as a Cincinnati police officer in December 1999, Officer Blaine Jorg acted as Spellen's primary field-training officer for approximately three months.
 {¶ 4} On November 7, 2000, Officers Jorg, Patrick Caton and David Hunter recognized Roger Owensby, a man who had fled from Officer Hunter a few weeks earlier. Officers Jorg and Caton questioned Owensby while Officer Hunter attempted to handcuff him. Owensby broke free and tried to get away. As the three officers chased him, Owensby fell and Officer Jorg grabbed him. As Owensby and Officer Jorg struggled on the ground, Officer Caton issued an "officer needs assistance" call over his police radio. In response, numerous officers, including Spellen, arrived at the scene. In the meantime, Owensby had been subdued, handcuffed, and placed in the backseat of a police cruiser.
 {¶ 5} Upon Spellen's arrival, an advisory was issued to disregard the call for assistance, but Spellen remained on the scene, primarily to learn the condition of Officer Jorg. Spellen saw Owensby sitting in the cruiser and stated to another officer, "Looks like he's, uh, hurting a little bit." Spellen then came upon a conversation between Officers Hunter and Jorg and two police sergeants, in which Spellen saw Officer Jorg demonstrate the hold that he had used in the process of placing Owensby under arrest.
 {¶ 6} After Spellen had left the scene, Owensby was eventually found to be unresponsive and in distress while in the cruiser. Officers pulled Owensby from the cruiser but were unable to resuscitate him. Owensby died while in the custody of the Cincinnati Police.
 {¶ 7} On November 12, 2000, during an interview by Cincinnati Police homicide investigators, Spellen reenacted the hold that he had seen Officer Jorg demonstrate. The demonstrated hold was around Owensby's neck so that his head was wrapped under Officer Jorg's forearm. During an interview by the Criminal Investigation Section of the Cincinnati Police Department, Spellen showed the same hold to the investigators.
 {¶ 8} On October 25, 2001, during Officer Jorg's criminal trial for involuntary manslaughter, Spellen was sworn as a witness. On direct examination, Spellen was asked to describe the hold that he had witnessed Jorg demonstrate on the night Owensby died. For the first time, Spellen demonstrated a different hold than the one he had previously demonstrated.
 {¶ 9} Following Spellen's sworn testimony in Officer Jorg's criminal trial, the Internal Investigation Section of the Cincinnati Police Department questioned Spellen. When asked specifically about the change in his demonstration of Officer Jorg's hold, Spellen responded that he had intentionally changed his demonstration of the hold so that it did not "look as threatening as the other movement" to the jury. Spellen admitted that he had lied.
 The Arbitrator's Ruling {¶ 10} The arbitrator noted that, at the time of Spellen's testimony in Officer Jorg's trial, "the City unquestionably had a rule proscribing dishonest behavior." The arbitrator cited Rule 5.01 of the Manual of Rules and Regulations and Disciplinary Process for the Cincinnati Police Division (hereinafter, "Rules Manual"), which provided, "No member shall knowingly state, enter, or cause to be entered on any official document, any inaccurate, false, incomplete, misleading, or improper information."
 {¶ 11} Then the arbitrator observed that a first-time violation of Rule 5.01 carried a potential penalty of a one-to-three-day suspension, as set forth by Section 15 of the Rules Manual, otherwise known as the "Matrix." The arbitrator stated that the city had implemented the Matrix to categorize offenses and to achieve consistency and fairness through its penalty ranges for initial and subsequent offenses.
 {¶ 12} But the arbitrator noted that the city had relied on Rule 13.01 of the Rules Manual in dismissing Spellen for his violation of Rule 5.01. Rule 13.01 provided in part, "In accordance with Civil Service Rules and State Law, any member may be dismissed from the Division when proven guilty of * * * [d]ishonesty." The arbitrator stated, "A review of the Civil Service Rules and State Law makes clear that the intent of Rule 13.01 was to set forth the statutory bases upon which a public employee `may' (not `shall') be dismissed."
 {¶ 13} The arbitrator recognized that the city had amended the Matrix since the time of Spellen's misconduct to include the possibility of termination for a first-time violation of Rule 5.01. But the arbitrator believed that imposition of the upgraded penalty range would be inappropriate because the amendment was promulgated following Spellen's violation of the rule. The arbitrator's decision implied that the penalty range would now permit termination on the same ground.
 {¶ 14} The arbitrator noted that although Rule 13.01 permitted the city to dismiss an officer for dishonesty, the city had not previously used the rule as a basis for termination. The arbitrator reiterated that a first-time violation of Rule 5.01 carried a potential penalty of, at most, a three-day suspension under the Matrix. The arbitrator stated, "The City should not ignore its own rules, or try to invoke for the first time ever Section 13.01, to terminate Officer Spellen." In conclusion, the arbitrator stated that Spellen had "lied while in his official capacity as a City of Cincinnati Police Officer, wearing his uniform, having taken an oath, and testifying in a criminal trial, his conduct was indeed `egregious' and a three day suspension is appropriate."
 Standard of Review {¶ 15} Judicial review of arbitration proceedings is governed by R.C.2711.10. The statute sets forth the limited circumstances under which a court may vacate an arbitration award. In this case, the city's motion to vacate the arbitrator's award was premised upon the ground that the arbitrator had exceeded his powers, as described by R.C. 2711.10(D). That section provides that an arbitrator's award shall be vacated if the arbitrator "exceeded [his or her] powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made."
 {¶ 16} An arbitrator's award "will not be easily overturned or modified. It is only when the arbitrator has overstepped the bounds of his or her authority that a reviewing court will vacate or modify an award."[1] A reviewing court will not vacate an arbitrator's award as long as the award "draws its essence from the collective bargaining agreement."[2] For an award to draw its essence from the collective-bargaining agreement, "there must be a rational nexus between the agreement and the award."[3]
 The Trial Court's Ruling {¶ 17} In a well-reasoned decision, the trial court vacated the arbitrator's award "[b]ecause the [collective-bargaining] Agreement explicitly permits termination for `just cause,' and because the Arbitrator's award reinstating Officer Spellen to duty does not draw its essence from the Agreement." In two assignments of error, the FOP now argues that the trial court erred by vacating the arbitrator's award (1) where the arbitrator had not exceeded his authority, and (2) where the court substituted its judgment for that of the arbitrator. Because these assignments are predicated on the same alleged error, we address them together.
 The Collective-Bargaining Agreement {¶ 18} In this case, Article II of the collective-bargaining agreement provided in part, "The FOP recognizes that, except as provided in this labor agreement, the City of Cincinnati retains the following management rights as set forth in Ohio Revised Code Section 4117.08(C) 1-9: `* * * 5. To suspend, discipline, demote or discharge for just cause, or lay-off, transfer, assign, schedule, promote or retain employees * * *.'" (Emphasis added.)
 {¶ 19} Under the agreement, FOP members were entitled to a grievance procedure in case there was "a disagreement as to whether the City has disciplined an employee for just cause." Such a grievance was subject to arbitration. The agreement then set forth the arbitrator's powers: "[t]he Arbitrator shall have no power to render a decision that will add to, subtract from, or alter, change or modify the terms of this agreement and his/her power shall be limited to interpretation or application of the express terms of this agreement."
 Just Cause {¶ 20} An arbitrator must make two determinations in deciding whether an employer has disciplined or discharged an employee for just cause: "(1) whether a cause for discipline exists and (2) whether the amount of discipline was proper under the circumstances. * * * `In applying the test of `just cause' the arbitrator is generally required to determine two factors: (a) has the commission of the misconduct, offense or dereliction of duty, upon which the discipline administered was grounded, been adequately established by the proof; and (b) if proven or admitted, the reasonableness of the disciplinary penalty imposed in the light of the nature, character and gravity thereof — for as frequently as not the reasonableness of the penalty (as well as the actual commission of the misconduct itself) is questioned or challenged in arbitration.'"[4]
 {¶ 21} In this case, the arbitrator recognized that the city had just cause to discipline Spellen following his admission that he had lied under oath in the criminal jury trial of his fellow officer. The arbitrator acknowledged the severity of Spellen's misconduct stemming from his violation not only of the city's Rules Manual, but of the general standard of conduct to which police officers are held: "Even aside from Rule 5.01, from the time he entered the police force in July 1999, Officer Spellen had sufficient training and understanding regarding the need to be honest in all matters at all times. Additionally, * * * the general requirement to be honest in all matters as a law enforcement officer is recognized by all members of the Cincinnati Police Department. * * * It is also common sense and an inherent expectation that law enforcement officers taking an oath to uphold laws and serve the community must not lie. Honesty and service to the community are expectations of all law enforcement officers. A violation of this trust impairs an officer's ability to perform the duties of his/her job."
 {¶ 22} The arbitrator's comments reflect the general public policy regarding the conduct of police officers as enunciated by the Ohio Supreme Court. "[I]t is settled public policy `* * * that police officers are held to a higher standard of conduct than the general public.' [Citations omitted.] Law enforcement officials carry upon their shoulders the cloak of authority of the state. For them to command the respect of the public, it is necessary then for these officers even when off duty to comport themselves in a manner that brings credit, not disrespect, upon their department."[5]
 {¶ 23} We agree that the city had just cause to discipline Spellen under the terms of the collective-bargaining agreement. Certainly, calculated perjury by a police officer, sworn to uphold the law and familiar with the requirements for truth in a court proceeding, would have to fall within the bounds of "just cause" as set forth by the collective-bargaining agreement. Spellen's actions in this case strike at the very foundation of our legal system and act to erode the public's confidence in it.
 {¶ 24} We note that, following the arbitrator's determination that the city had cause to discipline Spellen, the arbitrator had the authority to review the type of discipline imposed so long as the arbitrator's decision derived its essence from the collective-bargaining agreement.[6]
In this case, the arbitrator did not believe that the discipline imposed by the city was appropriate under the Matrix. We must determine whether the trial court correctly held that the arbitrator's decision in this respect failed to draw its essence from the collective-bargaining agreement.
 Essence of the Collective-Bargaining Agreement {¶ 25} The trial court noted that the arbitrator's discussion focused "wholly on whether the City violated its Manual and Matrix, and not on whether such a violation constituted a breach of the Agreement itself." The court recognized that it was not charged with second-guessing the arbitrator's interpretation of the agreement, but noted that the arbitrator's award was based solely on the premise that discipline in accordance with the Matrix was required by the collective-bargaining agreement. The court concluded that the Matrix had not even been incorporated into the agreement. Accordingly, the court held that the award did not draw its essence from the agreement itself and exceeded the arbitrator's authority as expressed by the agreement's prohibition against adding to its terms.
 {¶ 26} In determining whether the trial court properly concluded that the arbitrator's decision did not draw its essence from the agreement, we are guided by the Ohio Supreme Court's decision in Internatl. Assn. ofFirefighters, Local 67 v. Columbus.[7] In that case, the court held that an arbitrator had exceeded his authority by relying on rules extraneous to a collective-bargaining agreement to determine the eligibility of union employees to receive paid injury leave. The court held that "[a]n arbitrator is confined to interpreting the provisions of a [collective-bargaining agreement] as written and to construe the terms used in the agreement according to their plain and ordinary meaning. * * * As this court has previously emphasized, an arbitrator may not create a contract of his own by imposing additional requirements not expressly provided for in the agreement."[8]
 {¶ 27} In this case, the collective-bargaining agreement between the city and the FOP recognized both the city's right to discharge an employee for just cause and an employee's right to disagree about whether he or she had been disciplined for just cause. In the case of such a disagreement, the employee was entitled to arbitration. But the arbitrator's powers as explicitly described in the agreement were limited to the interpretation or application of the express terms of the agreement. The arbitrator could not render a decision that would add to, subtract from, or alter in any way the terms of the agreement.
 {¶ 28} The agreement did not require the city to resort to any particular outside source in imposing discipline upon an employee. As the arbitrator correctly noted, the city had unilaterally developed its Rules Manual and the Matrix contained therein — its rules and disciplinary penalties were nowhere mentioned in the collective-bargaining agreement. Nonetheless, the arbitrator sustained the grievance because he found that the city had not appropriately imposed the penalty under the Matrix. The arbitrator departed from the terms of the collective-bargaining agreement by restricting the city's ability to sanction Spellen to the disciplinary Matrix in its Rules Manual, even though the Rules Manual was, as the trial court stated, "nowhere referenced in or required by the terms of the Agreement itself."
 {¶ 29} The trial court correctly noted that while the city could promulgate a Matrix of potential disciplinary actions that it would "seek to apply to various types of alleged officer conduct in order to promote disciplinary consistency[,] the City's expression of that purpose, however, does not give the City the power to impose those penalties in a manner inconsistent with the Agreement." But the arbitrator could not restrict the city, in its imposition of discipline, to a particular subsection of its Rules Manual, to the exclusion of the entire manual or, more importantly, to the exclusion of the agreement itself. As the trial court pointed out, the arbitrator's decision went so far as to imply that the agreement would currently permit termination for Spellen's first-time violation of Rule 5.01.
 {¶ 30} The collective-bargaining agreement expressly allowed the city to terminate an employee for just cause. The agreement expressly restricted the arbitrator to the interpretation and application of its own terms, and not to the terms of the Rules Manual or its Matrix. Because the arbitrator relied on a source outside the agreement, the arbitrator's modification of Spellen's discipline "could not be rationally derived from the terms of the agreement."[9] Since there was no "rational nexus" between the agreement and the award, the essence of the arbitrator's decision could not have been drawn from the agreement.
 {¶ 31} Accordingly, we hold that the trial court correctly determined that the arbitrator exceeded his authority by relying on rules extraneous to the collectivebargaining agreement to determine whether the city's discipline was appropriate under the agreement. We overrule both assignments of error and affirm the judgment of the trial court.
Judgment affirmed.
Sundermann, J., concurs.
Doan, P.J., dissents.
[1] Queen City Lodge No. 69, Fraternal Order of Police, HamiltonCounty, Ohio, Inc. v. Cincinnati (1992), 63 Ohio St.3d 403, 407, 588
N.E.2d 802.
[2] Id. at 406, 588 N.E.2d 802, citing United Steelworkers of Americav. Enterprise Wheel Car Corp. (1960), 363 U.S. 593, 597,80 S.Ct. 1358.
[3] Internatl. Assn. of Firefighters, Local 67 v. Columbus,95 Ohio St.3d 101, 102, 2002-Ohio-1936, 766 N.E.2d 139.
[4] Bd. of Trustees of Miami Twp v. Fraternal Order of Police, OhioLabor Council, Inc. (1998), 81 Ohio St.3d 269, 272, 690 N.E.2d 1262, citing Schoonhoven, Fairweather's Practice and Procedure in Labor Arbitration (3 Ed. 1991).
[5] Jones v. Franklin Cty. Sheriff (1990), 52 Ohio St.3d 40, 43, 555
N.E.2d 940.
[6] See Bd. of Trustees of Miami Twp., supra.
[7] 95 Ohio St.3d 101, 2002-Ohio-1936, 766 N.E.2d 139.
[8] Id. at 103-104, 2002-Ohio-1936, 766 N.E.2d 139, citing Ohio Officeof Collective Bargaining v. Ohio Civ. Serv. Emp. Assn., Local 11,AFSCME, AFL-CIO (1991), 59 Ohio St.3d 177, 572 N.E.2d 71.
[9] Ohio Office of Collective Bargaining, supra, at 183,572 N.E.2d 71.