UNITED STATES of America, Plaintiff-Appellant,

v.

Thomas E. BYRD, Defendant-Appellee.

No. 84–9001.

United States Court of Appeals, Eleventh Circuit.

July 23, 1985.

Jere W. Morehead, Asst. U.S. Atty., Atlanta, Ga., for plaintiff-appellant.

Charles W. Byrd, Butler, Ga., for defendant-appellee.

Before VANCE and HATCHETT, Circuit Judges, and LYNNE,* District Judge.

LYNNE, District Judge:

The United States appeals from the district court's order of September 25, 1984, dismissing the indictment returned by a grand jury of the Northern District of Georgia against appellee, Thomas E. Byrd,

* Honorable Seybourn H. Lynne, U.S. District Judge for the Northern District of Alabama, sitting by designation.

on July 11, 1984, and from its subsequent order of November 14, 1984, denying the government's motion for reconsideration. Concluding that the Court below misapplied the test articulated in *Kastigar v. United States*, 406 U.S. 441, 92 S.Ct. 1653, 32 L.Ed.2d 212 (1972), we reverse.

## I.

## BACKGROUND

Appellee Byrd testified before a federal grand jury in Atlanta, Georgia, on June 16, 1983. This grand jury (the first grand jury) was investigating possible bribery, extortion, and other unlawful acts by several members of the Georgia Department of Labor (Department). At that time, Byrd was an employee of the Department. He and other Department employees testified before that grand jury. During questioning by Assistant United States Attorney (AUSA) Robert S. Stubbs, Byrd invoked the Fifth Amendment. At that point in time, Byrd was not a specific target of the investigation, but he was warned *in advance of his testimony* that the government might seek an indictment in the future based on information the government had previously obtained.

Following his invocation of the Fifth Amendment, the federal prosecutors sought and obtained a grant of "use and derivative use immunity" for Byrd pursuant to 18 U.S.C. §§ 6002, 6003. Thereafter, he was compelled to testify to certain matters which incriminated him and other Department officials.

Byrd's immunized testimony before the grand jury was recorded and transcribed and in approximately July of 1983, copies of the transcription were given to the U.S. Attorney's office and to Joseph Coleman, the lead FBI agent on the case.

On February 6, 1984, as a result of the testimony of Byrd and *various other witnesses*, elicited by AUSA Stubbs, the first grand jury returned indictments against Byrd, Commissioner Sam Caldwell, and other officials of the Department. Thereafter,

on March 22, 1984, AUSA Stubbs shredded and destroyed all copies of Byrd's immunized testimony, except the original, which was presented to the lower court for *in camera* inspection.

In May, 1984, AUSA Jere W. Morehead, was assigned to the Department case. He was assigned responsibility for assisting Stubbs in the prosecution of the *Caldwell* case and primary responsibility for prosecuting Byrd. He apparently had neither heard Byrd's immunized testimony nor had access to a transcript thereof.

Shortly thereafter, the lower court, on recommendation of Magistrate John Dougherty, dismissed the first indictment against Byrd because it had been returned by the same grand jury which had heard his immunized testimony. The order of dismissal was unopposed by the government.

On July 11, 1984, a different grand jury (the second grand jury) returned a new indictment against Byrd. He thereupon moved to dismiss this indictment, contending that it was based upon evidence and information derived from his immunized testimony before the first grand jury. An evidentiary hearing thereon was held on August 9, 1984, before Magistrate John Dougherty. At such hearing, FBI Agent Coleman testified that the only evidence presented to the second grand jury was his own testimony, which included (1) oral summaries of the testimony of various witnesses, excluding Byrd, who had appeared before the first grand jury, and (2) testimony concerning the contents of reports of witness interviews by FBI agents and other investigators which had been conducted *prior to June 18, 1983*. Coleman further testified that, although he had read a transcript of Byrd's immunized testimony prior to March 22, 1984, he had not had access to any transcripts since then.[1] He testified that he did not present any evidence to the second grand jury which was derived from his reading of Byrd's immunized testimony, nor did he in any way refer to such testimo-

---

1. As noted above, all copies of the transcript were destroyed on March 22, 1984, and the

original was then submitted to the lower court *in camera.*

ny. Finally, Coleman testified that he did not present any evidence to the second grand jury which had been obtained after Byrd's immunized testimony of June 16, 1983.

To corroborate Coleman's testimony before the magistrate, the government submitted the following evidence for *in camera* review: (1) the evidence against Byrd obtained by the government prior to the grant of immunity, which the government intended to use at trial; (2) Byrd's immunized testimony before the first grand jury, and (3) the transcript of Coleman's testimony before the second grand jury.[2] In addition, AUSA Morehead testified that he was the only federal prosecutor present in the grand jury room during the proceedings before the second grand jury, and that he had neither seen a transcript of the immunized testimony nor discussed any aspect thereof with anyone. Finally, AUSA Stubbs testified that, although he had participated along with the Chief of the Criminal Division, in the decision to reindict Byrd, he had not participated in the presentation before the second grand jury.

Following the hearing and review of the evidence submitted *in camera,* the magistrate found that "all of the evidence was known to the government or its agents prior to June 18, 1983." (R. 235).[3] Nevertheless, the magistrate recommended dismissal of the indictment because (1) AUSA Stubbs, who had heard Byrd's immunized testimony and had access to the transcripts between July, 1983, and March, 1984, had participated in the decision to reindict Byrd, and (2) if the government's pending motion[4] to merge Byrd's trial with that of Commissioner Caldwell and others were granted, Coleman and Stubbs, who had primary responsibility for the Caldwell prosecution, "would be seated at the counsel table with AUSA Morehead and free to make suggestions as to the course of conduct of the trial of [Byrd]." (R. 240).

After considering the magistrate's recommendation, the district court decided to dismiss the indictment, but on a much narrower ground. Although the court had before it all of the *in camera* materials submitted by the government and did not specifically find that Byrd's immunized testimony had been used in any way, the court nevertheless dismissed the indictment because there was "a *possibility* that Coleman's awareness of the contents of Byrd's testimony may have tainted his summary of the testimony of other witnesses who appeared before the first grand jury." (R. 332) (emphasis supplied). The court further held that Coleman's testimony "that he did not make any use of Byrd's testimony, although made in good faith [was] inadequate" to negate this possibility. (R. 331).

The government then filed a motion to reconsider, insisting that the abstract possibility that Coleman might have incorporated Byrd's immunized testimony into his summaries of the testimony of other witnesses would be conclusively refuted by a comparison of the transcripts of each witness' interview reports and testimony adduced before the first grand jury with the transcript of Coleman's testimony before the second grand jury. Again, although the district court had all of these documents before it *in camera* and made no specific finding that they revealed any evidence that Byrd's immunized testimony had been used against him in any way, the court nevertheless reaffirmed its dismissal of the indictment "based on its analysis in its previous order." (R. 342). Alternatively, the court held that it was *improper* to consider *in camera* evidence in determining whether the government has a legitimate source for its evidence independent

---

**2.** The magistrate reported that he accepted this evidence for *in camera* review over Byrd's objection (R. 235).

**3.** While the court neither explicitly adopted nor rejected this finding of the magistrate, we assume its *sub silentio* approval thereof.

**4.** The government filed a motion in the lower court to merge the trial of Byrd with the trial of the other labor department officials. Because of its disposition of *Byrd,* the court never ruled upon this motion.

of the immunized testimony, "except in the most exigent circumstances." (R. 343).

## II.

## KASTIGAR APPLIED

This appeal presents problems of constitutional magnitude concerning the scope and effect of "use immunity" as contrasted with the erstwhile "transactional immunity." In this case, Byrd was afforded "use and derivative use immunity" pursuant to 18 U.S.C. § 6002.[5] In *Kastigar v. United States*, 406 U.S. 441, 92 S.Ct. 1653, 32 L.Ed.2d 212 (1972), the Supreme Court held that "such immunity from use and derivative use is coextensive with the scope of the privilege against self-incrimination, and therefore is sufficient to compel testimony over a claim of privilege." 406 U.S. at 453, 92 S.Ct. at 1661. The Court reasoned that the Fifth Amendment privilege against self-incrimination

... has never been construed to mean that one who invokes it cannot subsequently be prosecuted. Its sole concern is to afford protection against being "forced to give testimony leading to the infliction of 'penalties affixed to ... criminal acts.'" Immunity from the use of compelled testimony, as well as evidence derived directly or indirectly therefrom, affords this protection. It prohibits the prosecutorial authorities from using the compelled testimony in *any* respect, and it therefore insures that the testimony cannot lead to the infliction of criminal penalties on the witness ... [I]mmunity from use and derivative use "leaves the witness in substantially the same position as if the witness had

claimed his privilege" in the absence of a grant of immunity ... This protection .... is all that the Constitution requires even against the jurisdiction compelling testimony by granting immunity.

406 U.S. at 453, 458–9, 92 S.Ct. at 1661, 1663–4 (footnotes omitted) (emphasis in original). In fashioning this doctrine, however, the Court emphasized that

A person accorded this immunity under 18 U.S.C. § 6002, and subsequently prosecuted, is not dependent for the preservation of his rights upon the integrity and good faith of the prosecuting authorities.... 'Once a defendant demonstrates that he has testified, under a ... grant of immunity, to matters related to the federal prosecution, the federal authorities have the burden of showing that their evidence is not tainted by establishing that they had an independent, legitimate source for the disputed evidence.'
...

This burden of proof, which we reaffirm as appropriate, is not limited to a negation of taint; rather, it imposes on the prosecution the affirmative duty to prove that the evidence it proposes to use is derived from a legitimate source wholly independent of the compelled testimony.

406 U.S. at 460, 92 S.Ct. at 1665 (*quoting Murphy v. Waterfront Commission*, 378 U.S. 52, 79 n. 18, 84 S.Ct. 1594, 1609 n. 18, 12 L.Ed.2d 678 (1964).

■ Thus, in the case *sub judice*, the government's burden under *Kastigar* was simply to prove that the evidence presented to the grand jury[6] (and ultimately the evi-

---

**5.** This section provides as follows:

Whenever a witness refuses, on the basis of his privilege against self-incrimination, to testify or provide other information in a proceeding before or ancillary to—
(1) a court or grand jury of the United States,
(2) an agency of the United States, or
(3) either House of Congress, a joint committee of the two Houses, or a Committee or a subcommittee of either House,
and the person presiding over the proceeding communicates to the witness an order issued under this part, the witness may not refuse to comply with the order on the basis of his

privilege against self-incrimination; but no testimony or other information compelled under the order (or any information directly or indirectly derived from such testimony or other information) may be used against the witness in any criminal case, except a prosecution for perjury, giving a false statement, or otherwise failing to comply with the order.

**6.** 18 U.S.C. § 6002 speaks to use of the immunized testimony in "any criminal case," and thus prohibits its use in grand jury proceedings as well as at trial. *United States v. Gregory*, 730 F.2d 692, 697 (11th Cir.1984).

dence utilized at trial) was derived from legitimate, independent sources. Although *Kastigar* notes that this is a "heavy burden" in practical terms, 406 U.S. at 461, 92 S.Ct. at 1665, subsequent cases controlling in this circuit have made it clear that in legal terms, the government is only required "to demonstrate by a preponderance of the evidence an independent source for all evidence introduced." *United States v. Seiffert,* 501 F.2d 974, 982 (5th Cir.1974), ("*Seiffert II*"), *cited with approval in United States v. Gregory,* 730 F.2d 692, 698 (11th Cir.1984), *cert. denied* —— U.S. ——, 105 S.Ct. 1170, 84 L.Ed.2d 321 (1985).

 In the present case, the district court applied a far stricter test. The magistrate, upon review of the *in camera* evidence, specifically found that all of the evidence relied upon by the government was obtained prior to the time Byrd gave his immunized testimony. (R. 235). The district court, without any specific finding to the contrary, simply held that there was "a possibility" that Agent Coleman had incorporated Byrd's immunized testimony into his summaries of the testimony of other witnesses before the first grand jury. Indeed, the court pointed to no specific instances where Coleman's summaries of the testimony of witnesses before the grand jury were inaccurate, even though the court had the transcripts of both grand jury proceedings available *in camera.* This ignores the plain import of *Seiffert II.* The government is not required to negate all abstract "possibility" of taint. Rather, the government need only show by a preponderance of the evidence that, in fact, the evidence used was derived from legitimate, independent sources. *Seiffert II,* 501 F.2d at 982. Assuming that it was proper for the government to satisfy this

burden by the submission of *in camera* evidence, *see infra* at pp. 5447–5449, it was incumbent upon the district court to examine the evidence and make a specific factual determination, based upon the actual record, of whence the evidence was derived. The government was only required to show that the evidence more likely than not was derived independently of Byrd's testimony. Of course, Coleman's representations that he did not make any use of Byrd's testimony, standing alone, may be inadequate to meet that burden. *See United States v. Seiffert,* 463 F.2d 1089, 1092 (5th Cir.1972) ("*Seiffert I*"). However, if a review of the actual transcripts establishes that Coleman accurately described the testimony of witnesses at the first grand jury proceeding without prejudicial distortion, then clearly the government has satisfied its burden under *Kastigar.*[7] It is apparent, then, that the court below applied the wrong legal standard in assessing the government's evidentiary showing.[8]

Byrd advances other arguments in support of the lower court's ruling, however. He argues that *Kastigar* "does not limit the court's inquiry to only the source of evidence introduced by the government," but prohibits any use of immunized testimony for *non-evidentiary* purposes as well. This is a difficult question, and one that is not clearly answered by *Kastigar.* Moreover, neither the Fifth Circuit nor the Eleventh Circuit seem to have addressed the question directly.

Essentially, Byrd insists that the district court's dismissal was justified on the grounds asserted by the magistrate. First, he contends that there is a strong likelihood that his immunized testimony was used against him by the government in

---

**7.** The *in camera* evidence is not contained in the record.

**8.** Even if the review of the evidence does show that Coleman in fact incorporated Byrd's immunized testimony into his summaries of the testimony of the other witnesses, the indictment must nevertheless be sustained "if use of the prohibited evidence is found to be harmless," beyond a reasonable doubt. *United States v. Gregory,* 730 F.2d 692, 698 (11th Cir.1984), *cert.*

*denied* —— U.S. ——, 105 S.Ct. 1170, 84 L.Ed.2d 321 (1985). *Accord, United States v. Beery,* 678 F.2d 856, 863 (10th Cir.1982). The court below never inquired whether the evidence would have been sufficient to sustain an indictment even if Byrd's immunized testimony had not been improperly used or presented, because the court never actually found that the testimony had in fact been so used—only that there was a theoretical "possibility" that it might have been. (R. 332).

deciding to reindict him. As a basis for this contention, Byrd points to the fact that he was not officially a "target" of the investigation prior to giving his immunized testimony, and the fact that AUSA Stubbs, who had heard his immunized testimony and had access to the transcripts, participated in the decision to reindict. With respect to this argument, it should be noted that *Kastigar* made no mention of any burden on the government to erect an impenetrable barrier between the prosecutors who hear or read the immunized testimony and those who decide to indict, even though the potential problem was an obvious one. Rather, the Court simply declared that "[b]oth the statute and the Fifth Amendment allow the government to prosecute using evidence from legitimate independent sources." *Kastigar*, 406 U.S. at 461, 92 S.Ct. at 1665. While *Kastigar* does emphasize that "immunity from use and derivative use leaves the witness and the Federal Government in *substantially* the same position as if the witness had claimed his privilege in the absence of a grant of immunity," 406 U.S. at 459, 92 S.Ct. at 1664 (emphasis supplied), the Court did not explicitly mandate that the position of the parties remain absolutely identical in every conceivable and theoretical respect. That would place a virtually insurmountable burden of proof upon the government, and would approach (if not result in) *de facto* transactional immunity. So long as none of the evidence presented to the grand jury is derived, directly or indirectly, from the immunized testimony, it can fairly be said that the defendant's immunized testimony has not been used to incriminate him.

It is noted that at least two circuits have held that once a prosecuting attorney reads a defendant's immunized testimony, he cannot thereafter participate in the *trial* of the defendant, even where all the evidence to be introduced was derived from legitimate independent sources. *United States v. Semkiw*, 712 F.2d 891 (3rd Cir.1983); *United States v. McDaniel*, 482 F.2d 305 (8th Cir.1973). In language that includes substantial *dicta*, the courts reasoned that a prosecutor who had read or heard the immunized testimony may still

Use it in some significant way short of introducing tainted evidence.... Such use could conceivably include assistance in focusing the investigation, *deciding to initiate prosecution*, refusing to plea-bargain, interpreting evidence, planning cross-examination, and otherwise generally planning trial strategy.... [I]f the immunity protection is to be coextensive with the Fifth Amendment, as it must be to be constitutionally sufficient, then it must forbid all prosecutorial use of the testimony, not merely that which results in the presentation of evidence before the jury.

*McDaniel*, 482 F.2d at 311 (emphasis supplied). *See also Semkiw*, 712 F.2d at 895; *United States v. Smith*, 580 F.Supp. 1418 (D.N.J.1984).

■ The binding precedent from this circuit apparently does not speak directly to the issue of whether prosecutors who have had access to immunized testimony may participate in the decision to indict; rather, the cases from this circuit and the old Fifth Circuit speak only in terms of the source of the government's evidence. *See, e.g., United States v. Gregory*, 730 F.2d 692, 698 (11th Cir.1984), *cert. denied* ─ U.S. ─, 105 S.Ct. 1170, 84 L.Ed.2d 321 (1985); *United States v. Seiffert*, 501 F.2d 974, 982 (5th Cir.1974) (*Seiffert II*). Thus, we must decide a question of first impression in this circuit: whether the government is required, under *Kastigar*, to demonstrate by a preponderance of the evidence that the decision to indict was not induced by the content of Byrd's immunized testimony, and if so, what proof or procedures would be sufficient to meet this burden. We do not read *Kastigar* to require a court to inquire into a prosecutor's motives in seeking indictment. So long as all the evidence presented to the grand jury is derived from legitimate sources independent of the defendant's immunized testimony, and the grand jury finds that independent evidence sufficient to warrant the return of an indictment, the defendant's privilege against self-incrimination has not been violated. At a minimum, the existence of independent evidence sufficient to establish probable cause to indict must be deemed to

raise a presumption that the decision to indict was not tainted. Any other result would be the equivalent of transactional immunity, for it is almost impossible to conceive of a method whereby the government could demonstrate by a preponderance of the evidence that the immunized testimony did not indirectly enter into a subsequent decision to prosecute. It is our view that the privilege against self-incrimination is concerned with direct and indirect *evidentiary* uses of compelled testimony, and not with the exercise of prosecutorial discretion. If the contrary views of *McDaniel* and *Semkiw* were adopted, the realistic difference between transactional immunity and use immunity would become hopelessly blurred if not totally extinguished, thus negating the plain import of *Kastigar* that "both [18 U.S.C. § 6002] and the Fifth Amendment allow the government to prosecute using *evidence* from legitimate independent sources." 406 U.S. at 461, 92 S.Ct. at 1665 (emphasis supplied).

■ Byrd next argues that dismissal of the indictment was proper because the government could theoretically utilize its knowledge of Byrd's testimony to decide which witnesses to call at trial, plan cross-examination of defense witnesses, interpret previously-discovered evidence, and make other strategic decisions concerning the evidence to be introduced at trial. *Cf. Semkiw,* 712 F.2d at 895; *McDaniel,* 482 F.2d at 311. This was also one of the grounds asserted by the magistrate in recommending dismissal of the indictment.

The short answer to this contention is that it is premature. While certain of the feared results—*e.g.,* the government's use of its knowledge of Byrd's immunized testimony to elicit evidence on cross-examination—would probably constitute an impermissible use of *evidence* derived indirectly from the immunized testimony,[9] that has

not yet taken place in this case. The mere theoretical possibility of an eventual *Kastigar* violation at trial is no grounds for dismissing the indictment. If and when the government seeks to elicit or introduce evidence indirectly derived from Byrd's testimony in such a manner, then Byrd would have cause to complain. At that point, the government would have the burden of showing by a preponderance of the evidence either that the prosecutors on the case had no direct or indirect access to the immunized testimony, or that the evidence adduced was derived from independent sources. Perhaps the government could meet its burden by demonstrating that everything revealed in Byrd's immunized testimony was previously known to the government through independent sources,[10] or that any new information obtained directly or indirectly from Byrd's testimony did not make its way into evidence or facilitate the discovery or introduction of other evidence. In any event, until tainted evidence is actually adduced at trial, Byrd's testimony simply has not been used against him, and it is premature to predict that it will be.

*McDaniel* and *Semkiw* are not to the contrary on this point. In each of those cases the trial had already taken place, and the courts simply held that the government had not carried its burden of establishing by a preponderance of the evidence that the prosecutors (who admittedly had full access to the defendants' immunized testimony in preparing for the trials), had not indirectly incorporated their knowledge of that testimony into the trial. *McDaniel,* 482 F.2d at 311; *Semkiw,* 712 F.2d at 893–95. Moreover, the court in *Semkiw* noted that the government "might easily have removed any cloud from the trial by assigning it to another attorney who did not and would not review the immunized testimo-

---

9. *Cf. Pillsbury Co. v. Conboy,* 459 U.S. 248, 264–271, 282–96, 103 S.Ct. 608, 618–621, 627–634, 74 L.Ed.2d 430 (1983) (opinions of Marshall, J., concurring, and Stevens, J., dissenting). *Compare* 459 U.S. at 257 n. 13, 103 S.Ct. at 614 n. 13 (majority opinion declining to reach issue).

10. *Cf. United States v. Catalano,* 491 F.2d 268, 272 (2d Cir.1974), *cert. denied* 419 U.S. 825, 95

S.Ct. 42, 42 L.Ed.2d 48 (1974) (evidence that prosecutor "had prior knowledge of substantially all the information covered in the [defendant's immunized] testimony" held sufficient to "foreclose the possibility that he made any use, direct or indirect, of the compelled testimony and any information derived therefrom").

ny." *Semkiw,* 712 F.2d at 895. In the case *sub judice,* this is precisely what the government has sought to do. If indeed AUSA Morehead has had no access to transcripts of the immunized testimony, and if no attorney who has heard or reviewed the testimony participates in the trial or preparation of the case, many of the conceivable abuses anticipated by the magistrate and by Byrd may be foreclosed.[11] Of course, there is still an arguable threat that Morehead will advertently or inadvertently derive some benefit in the preparation of the case by virtue of consulting with investigative agents (such as Coleman) or others who have been exposed to the immunized testimony during the course of the governmental investigation, but that possibility exists as a practical matter in every case in which an immunized witness is subsequently prosecuted for the transactions about which he has testified. So long as the government can demonstrate by a preponderance of the evidence that this did not in fact occur, or that if it did, it was harmless beyond· a reasonable doubt, then clearly any conviction ultimately obtained would not be invalidated. Moreover, under *Kastigar,* it would seem that a violation of the privilege against self-incrimination would not occur in any event unless such "use" of the immunized testimony resulted in the introduction of evidence not obtained wholly from independent sources.

For these reasons, the defendant's concerns about the possibility of subtle strategic and evidentiary uses of his immunized testimony at trial are premature, and are not a sufficient basis for dismissing a valid indictment.

### III.

### PROPRIETY OF IN CAMERA EVIDENCE IN A KASTIGAR HEARING

As an alternative basis for dismissal of the indictment, the district court held that it is improper to consider *in camera* evidence in a *Kastigar* hearing absent "the most exigent circumstances," and that, in the absence of other affirmative evidence, Coleman's representations that he did not make any use of Byrd's testimony in his presentation to the second grand jury, although made in good faith, were inadequate to prove that the evidence on which the indictment was based was obtained from legitimate independent sources. (R. 342–43). The district court made this ruling despite the fact that the *in camera* evidence had been admitted by the magistrate and extensively treated and considered in his report and recommendation. The Court reasoned that the *Kastigar* hearing was intended to be adversary in nature, and that this would be thwarted by the submission of *in camera* evidence.

■■■ While the *Kastigar* hearing is generally intended to be an evidentiary and adversary hearing, *see United States v. Gregory,* 730 F.2d 692 (11th Cir.1984); *United States v. Seiffert,* 501 F.2d 974 (5th Cir.1974), courts have in fact considered *in camera* evidence when claims of *Kastigar* violations are raised prior to trial. *See, e.g., United States v. Sockwell,* 699 F.2d 213, 217 (5th Cir.1983), *cert. denied* 461 U.S. 936, 103 S.Ct. 2106, 77 L.Ed.2d 311 (1983); *Little Rock School District v. Borden, Inc.,* 632 F.2d 700, 705 (8th Cir.1980); *United States v. Bianco,* 534 F.2d 501, 509, n. 11 (2d Cir.1976), *cert. denied* 429 U.S. 822, 97 S.Ct. 73, 50 L.Ed.2d 84 (1976). *See also United States v. Provenzano,* 688 F.2d 194, 203 (3rd Cir.1982), *cert. denied* 459 U.S. 1071, 103 S.Ct. 492, 74 L.Ed.2d 634 (1982) (*Kastigar* hearing unnecessary where government's documents demonstrated prior knowledge of the evidence used against the defendant). This is particularly reasonable where grand jury testimony is relied upon. As noted in *United*

---

**11.** We are not informed by the record whether it is contemplated that AUSA Stubbs will play any role in the preparation or trial of the *Byrd* case. In a *Kastigar* setting, we are of the firm opinion that it would be unwise to permit an attorney familiar with the immunized testimony to participate in the trial or preparation of the case. We also strongly suggest that an immunized witness *never* be tried with those whom he has implicated.

*States v. Zielezinski*, 740 F.2d 727, 733–34 (9th Cir.1984), the "district court is free to restrict the [Kastigar] hearing as necessary to protect grand jury secrecy," although the court is also free to order production of grand jury transcripts to defense counsel upon an adequate showing of compelling need. *See* Fed.R.Crim.P. 6(e)(2), 6(e)(3)(C).[12] The purpose of a *Kastigar* hearing—ensuring that the government's evidence has been obtained from legitimate, independent sources—is not necessarily defeated by the procedure of submitting the government's evidence to the court for *in camera* review in advance of trial. On the contrary, it was eminently proper to adopt that procedure under the facts of this case. Coleman alone presented the government's evidence before the second grand jury. In the evidentiary hearing be-

fore Magistrate Dougherty he testified as to its source.[13] The district court held: "Coleman's testimony is insufficient to satisfy the government's burden under *Kastigar*. His representations that he did not make any use of Byrd's testimony, although made in good faith, are inadequate." (R. 331). Logic compels the conclusion that the government was left but one recourse, to submit to the court for *in camera* inspection documents which purportedly confirm Coleman's representations and convincingly demonstrate that the second grand jury had before it legitimate evidence independent of Byrd's immunized testimony. Obviously, when the government has rested its case or the trial has been concluded and the need to avoid premature disclosure of the government's evidence has been dissipated, the *Kastigar*

12. Fed.R.Crim.P. 6(e)(2) generally prohibits the government from disclosing grand jury documents to defense counsel. Fed.R.Crim.P. 6(e)(3)(C) provides that:

> (C) Disclosure otherwise prohibited by this rule of matters occurring before the grand jury may also be made—
> (1) when so directed by a court preliminarily to or in connection with a judicial proceeding;
> (ii) when permitted by a court at the request of the defendant, upon a showing that grounds may exist for a motion to dismiss the indictment because of matters occurring before the grand jury; or
> (iii) when the disclosure is made by an attorney for the government to another federal grand jury.
> If the court orders disclosure of matters occurring before the grand jury, the disclosure shall be made in such manner, at such time, and under such conditions as the court may direct.

*Id.* Thus, the government did not act unreasonably in submitting such evidence *in camera* in the absence of a court order requiring or permitting it to do otherwise.

13. Q. What is your position, Agent Coleman?
A. I'm a special agent with the FBI, assigned to the Atlanta Field Office.
Q. And you have been the case agent for the investigation involving called Sam Caldwell and others, is that correct?
A. Yes.
Q. Did you testify before the second grand jury that indicted defendant Bird? (sic)
A. Yes.
Q. Do you recall the date of that testimony?
A. I believe it was July the 11th, 1984.

Q. In your testimony did you summarize certain government evidence against Bird? (sic)
A. Yes, Ma'am. (sic)
Q. From what kinds of sources did you derrive (sic) this evidence about what you testified?
A. From reports of interviews by FBI agents and other investigators and from reading grand jury transcripts of witnesses.
Q. Did you present any evidence relating to the defendant Bird's (sic) involvement in the crime charged, which evidence you had obtained subsequent to his immunized testimony in June of 1983?
A. No.
Q. Did you present any evidence to this second grand jury that was derived from your reading Mr. Byrd's transcript?
A. No.
Q. Did you refer to the transcript of that immunized testimony in any way before the grand jury?
A. No.
Q. Have you discussed the substance of the immunized testimony of defendant Bird (sic) with Mr. Morehead?
A. No.
Q. Have you discussed your recollections of that testimony with Mr. Morehead?
A. No.
Q. Do you presently have a copy of the transcript of the immunized testimony?
A. No.
Q. Did you have one at one time?
A. Yes, I did.
Q. And what happened to it?
A. I believe it was March 21 of 1984. At Mr. Stubbs' request I gave him the copy that I had.
(Transcript of Proceedings before Magistrate Dougherty, pp. 30–31).

motion may be renewed and all of the *in camera* evidence may be made available to the defense. *See United States v. DeDiego,* 511 F.2d 818, 824 (D.C.Cir.1975).

In any event, if the court below determined that the defense had a compelling need for the grand jury documents and the other evidence upon which the government relied, it had the authority to order production of those documents prior to trial and before resolution of the *Kastigar* issue. *See* Fed.R.Crim.P. 6(e). We conclude that dismissal of the indictment was an abuse of discretion in these circumstances. This seems particularly true when it is realized that the magistrate chose to accept the evidence *in camera* over Byrd's objection, and the government was never given an opportunity to submit its proof in proper form once the district court had declined to accept evidence *in camera*. *Compare United States v. Pabian,* 704 F.2d 1533, 1536 (11th Cir.1983) (dismissal of indictment for prosecutorial misconduct is an extreme sanction which should be infrequently invoked).

## CONCLUSION

For the foregoing reasons, the district court erred as a matter of law in its application of the *Kastigar* doctrine to the facts of this case, and, at a minimum, abused its discretion to the extent that it dismissed the indictment based upon the government's submission of evidence *in camera*.

**REVERSED and REMANDED.**