UNITED STATES of America, Plaintiff,

v.

Fredel WILLIAMSON, Defendant.

Crim. No. 89–37–MAC(DF).

United States District Court,
M.D. Georgia,
Macon Division.

May 8, 1992.

Charles E. Cox, Jr., Asst. U.S. Atty., Macon, Ga., for plaintiff.

Benjamin S. Waxman, Weiner, Robbins, Tunkey & Ross, P.S., Miami, Fla., for defendant.

FITZPATRICK, District Judge.

On November 26, 1991, this Court held an evidentiary hearing to determine whether defendant Fredel Williamson waived his Sixth Amendment right to confront his accuser by procuring the silence of his co-defendant Reginald Harris.

## BACKGROUND

In 1989 Fredel Williamson and Reginald Harris were indicted on three counts of drug related charges. They were tried separately. The government subpoenaed Reginald Harris to testify at Fredel Williamson's trial but Harris, who was under a compulsion order, invoked his Fifth Amendment privilege. This Court determined that Harris was unavailable and admitted Harris' post-arrest statements implicating Williamson through the testimony of DEA Agent Donald Walton. Williamson was convicted. In his appeal Williamson contends that the District Court's admission of Agent Walton's testimony under Federal Rules of Evidence 804(b)(3) violated his right to confront his accuser. The government moved to remand the case to this Court for an evidentiary hearing to determine whether Fredel Williamson had procured the silence of his co-defendant. After this Court certified to the Eleventh Circuit that it would hold an evidentiary hearing on this issue, the Eleventh Circuit granted the government's motion.

## DISCUSSION

A number of issues were raised at the evidentiary hearing including the appropriateness of the hearing itself, whether the government's evidence was directly or indirectly derived from sources independent of an immunized statement Williamson made, the admissibility of statements under Federal Rule of Evidence 801(d)(2)(E), as well as the waiver issue.

### I. APPROPRIATENESS OF THE EVIDENTIARY HEARING

Defendant contends that the evidentiary hearing was inappropriate based on the

doctrines of law of the case, issue preclusion and waiver, and because there is no sound procedural vehicle for such a hearing. Under *United States v. Ellsworth,* 814 F.2d 613 (11th Cir.1987), a District Court may consider a post-judgment motion and either deny or certify that it will grant the motion. The decision whether or not to certify that it will hear the motion is within a court's discretion. *Id.* Upon certification from the District Court, an Eleventh Circuit panel will consider the motion to remand.

■ Admittedly, the Court has been unable to locate a case in a posture analogous to the instant case. The Eleventh Circuit, however, granted the government's motion for a limited remand. This Court neither has the authority to review its own decision to grant certification, since this case was remanded for the limited purpose of conducting an evidentiary hearing, nor does it have the power to review the Eleventh Circuit's order to remand. The Eleventh Circuit, however, has the power to review whether or not this Court's decision to certify that it would conduct the hearing was an abuse of discretion.

## II. KASTIGAR ISSUE

On January 5, 1990 Williamson admitted to Assistant United States Attorney ("AUSA") Deborah Fowler and DEA Agent Donald Walton that he paid Harris' attorneys' fees. The government concedes that the statement should be treated as immunized under 18 U.S.C. §§ 6002 and 6003.[1] Williamson argues that the testimony of government witnesses Reginald Harris and Virginia Brinkley (Harris's mother) should be excluded because his immunized statement was the basis of the government's motion for remand and because the witnesses' testimony was shaped, directly or indirectly, by Williamson's immunized statement.

■ First, Williamson argues that the testimony of Harris and Brinkley should be excluded because it was shaped, directly or indirectly, by his immunized statement. Use immunity prohibits the use of compelled testimony, or any evidence derived directly or indirectly from that testimony, against the witness in any criminal prosecution. 18 U.S.C. § 6002 *et seq.; see generally Kastigar v. United States,* 406 U.S. 441, 92 S.Ct. 1653, 32 L.Ed.2d 212 (1972). Once a defendant has established that his statement was given under a grant of use immunity the burden of proof shifts to the prosecution to prove, by a preponderance of the evidence, that the evidence presented was derived from independent sources. *United States v. Byrd,* 765 F.2d 1524, 1526 (1985). In order to establish legitimate independent sources, "the government [must] show that all the evidence presented ... either was in the possession of the government prior [to Williamson's] immunized [statement] or was derived from a source independent of [Williamson's statement] (i.e. that [Williamson's] testimony provided neither new direct evidence nor investigatory leads)." *United States v. Dynalectric,* 859 F.2d 1559, 1579 n. 27 (citing *Byrd,* 765 F.2d 1524, 1531 (1985)). While the government's burden is not "limited to a negation of taint", *Kastigar,* 406 U.S. at 460, 92 S.Ct. at 1665, "[t]he government is not required to negate all abstract possibility of taint." *Byrd* at 1529. "[T]he government [is] only required to show that the evidence more likely than not was derived independently of [the immunized] testimony." *Id.* The government did not have the witnesses' testimony in its possession before Williamson gave his statement. Thus, the issue is whether or not Harris and Brinkley are legitimate independent sources.

■ Although the government waited until the eleventh hour to interview Harris and Brinkley on the fees issue, the Court concludes that both witnesses are legit-

---

**1.** When Williamson was interviewed on January 5, 1990, the Compulsion Order entered by the court had expired, and the United States had not obtained a new Compulsion Order. According to the testimony given in a hearing in *U.S. v.* *Fredel Williamson,* 1:90–CR–266–WCO in the Northern District of Georgia, however, all parties were acting in belief that Williamson was subject to a valid Compulsion Order on January 5, 1990.

imate independent sources for the following reasons. First, the prosecution suspected that Harris was not paying his own legal fees before Williamson made his statement. This is evidenced by the government's request for a conflict of interest hearing. Additionally, Virginia Brinkley testified that during her son's trial and through sentencing Agent Walton asked her about the source of Harris's attorneys' fees. (R. 83). Both witnesses testified that Williamson told them that he was cooperating with the government before any government agent interviewed them. (R. 85, 96).

In addition, the government did not initiate contact with these witnesses. Brinkley called Agent Walton several times after Harris was sentenced to see if he would talk to her or Harris, but he did not interview either one. (R. 83–84). Harris was contacted by DEA Agents Jack Harvey and Ron Gear in the summer of 1990, (R. 97–98), but they wanted information about a case in the Northern District. Agent Gear did tell Harris that Williamson was cooperating with the government in a money laundering case, (R. 96), however, Williamson already had advised Harris that he was cooperating. Furthermore, in a letter to Agent Walton, dated October 18, 1990, Harris offered information concerning his case. Although he spoke with Walton over the phone, he never discussed the fee arrangement with him and Walton never indicated that he was seeking information concerning the fee paying arrangement. Harris testified he knew that Walton wanted information concerning the payment of his legal fees because Ed Adams told him Williamson's chances on appeal would be harmed if the government could prove Williamson paid his legal fees. (R. 101).

In addition to her phone calls to Agent Walton, Brinkley testified she went to see Agent Harvey on her own initiative. (R. 88). Attorney Charles Calhoun wrote Virginia Brinkley in July of 1991, stating that Agent Harvey had contacted him concerning her willingness to offer information about Harris and Williamson. Both witnesses testified that the first person they told about the fee paying arrangement was AUSA Cox who interviewed Harris approximately one week before the hearing and Brinkley the day before the hearing.

Although the witnesses were not contacted until after Williamson filed a motion in limine to exclude the immunized statement, Williamson's immunized statement did not lead the government to either witness. Rather, once the government realized it would not be able to use the statement [2], it utilized witnesses who previously had offered information and who had been told by the Defendant himself that he was cooperating. Thus, the Court concludes that the government has established that Harris and Brinkley are legitimate independent sources by a preponderance of the evidence.

Second, Williamson contends Harris's and Brinkley's testimony should be excluded because the government used Williamson's immunized statement to support its motion to remand for an evidentiary hearing. In *Byrd* the Eleventh Circuit stated that the privilege against self-incrimination was "concerned with direct and indirect *evidentiary* uses of compelled testimony and not with the exercise of prosecutorial discretion." 765 F.2d at 1531. (emphasis in original). The defendant in *Byrd* argued that the prosecutor's decision to reindict the defendant was induced by the content of his immunized statement. Similarly, Williamson's statement supported its motion to remand. Since the statement was not introduced into evidence, however, it was not used in a prohibited manner. Thus, the use of the statement to support the motion to remand does not taint Harris's and Brinkley's testimony.

---

**2.** The evidence presented showed that the government's witnesses were not contacted until after Defendant filed his motion to exclude his immunized statement. The government's intent to use the immunized statement at the evidentia-

ry hearing is evidenced by the prosecution's postponement of the hearing in August because Agent Walton, "the government's witness" would be unavailable to testify. (Letter from AUSA Charles Cox dated August 22, 1991).

## III. HEARSAY OBJECTIONS[3]

### A. STATEMENTS OF SONYA SALO

During the hearing the government sought to introduce certain statements made by Sonya Salo through the testimony of Virginia Brinkley and Reginald Harris under Federal Rule of Evidence 801(d)(2)(E). The Court noted Williamson's objections and reserved its ruling on the admissibility of the following testimony:

1. Harris' testimony that after his in chambers conference alone with this Court at the conflict hearing, Salo asked him what he replied when this Court asked him who was paying his legal fees. Harris testified that when he told her that he had said the money was coming from an insurance settlement, Salo said "good". (R. 11).

2. Virginia Brinkley's testimony that when Salo and Adams were initially retained to represent Harris Salo wanted to know how she was going to get paid and who was going to pay her. (R. 60).

3. Brinkley's testimony that Salo told her that the government would to want to know where Brinkley got the money and how she was able to pay the attorneys' fees. (R. 61). Brinkley then proposed saying money from an insurance settlement was used and Salo replied "fine." (R. 61).

4. Brinkley's testimony that after the sentencing hearing she asked Salo what she was going to do to help her son. Salo replied, "I'm not touching another piece of paper until I get the rest of my money." When Brinkley stated that she thought Carlton [Williamson] was paying the fees Salo said, "Well, you find Carlton then." (R. 68).

The government contends that Salo's statements are admissible because she, along with the Williamson and Ed Adams, were part of a conspiracy to obstruct justice by silencing Reginald Harris. Defendant argues that the statements should not be admitted because Salo was not shown to

be unavailable and the statements were not shown to be reliable.

Federal Rule of Evidence 801(d)(2)(E) excludes statements made "by a co-conspirator of a party during the course and in furtherance of the conspiracy" from the definition of hearsay. Before admitting statements under the co-conspirator rule the "government must establish by a preponderance of the evidence: (1) that there was a conspiracy (2) that the defendant and the declarant were members of the conspiracy, and (3) that the statement was made in the course of and in furtherance of the conspiracy." *United States v. Van Hemelryck*, 945 F.2d 1493, 1498 (11th Cir.1991). If the government can establish the admissibility of the statements under 801(d)(2)(E) then it need not establish their reliability, *United States v. Inadi*, 475 U.S. 387, 106 S.Ct. 1121, 89 L.Ed.2d 390 (1986), or that Salo was unavailable. *Bourjaily v. United States*, 483 U.S. 171, 182, 107 S.Ct. 2775, 2782, 97 L.Ed.2d 144 (1987). When evaluating the admissibility of co-conspirator statements a court may consider both the statement itself and independent evidence. *Bourjaily v. United States*, 483 U.S. at 181, 107 S.Ct. at 2781.

The first question is whether there was a conspiracy. Virginia Brinkley testified that Fredel Williamson and Carlton Williamson came to her home after Harris was arrested. Fredel Williamson promised to hire an attorney for Harris. (R. 53). Then, upon his instruction, Carlton Williamson gave her money. (R. 54). The next day she accompanied Defendant and Carlton Williamson to the offices of Ed Adams and Sonya Salo. (R. 55). They stopped at a house to get money. Both men went inside and Williamson came out carrying a brown sack, which Fredel Williamson said contained money to help Harris. (R. 57). While at the attorneys' office, Fredel Williamson handed Adams the sack without discussion. (R. 59). Brinkley initially went

---

**3.** In addition to the statements discussed the government argued in its brief that Williamson could not introduce certain statements of Reginald Harris' counsel at the conflict of interest

hearing in order to show Harris' state of mind. The Court notes, however, that the government's objection was overruled. (R. 23).

807

into Adams' office with Fredel and Carlton Williamson but Adams asked her to step outside. (R. 58). After a few minutes, Adams, Fredel and Carlton came out of Adams's office and Salo came out of her office. (R. 59). When Salo asked how she was going to get paid and who was going to pay her, the Defendant and Carlton Williamson said they would. Salo then told Brinkley that the government would want to know who paid her and how Brinkley was able to pay the fees. Brinkley suggested saying that the money came from a personal injury settlement Harris had received. Salo responded "Fine." (R. 61). The meeting ended and on the way home Fredel Williamson told her it would be best if Harris did not know who paid the fees. (R. 62).

After reviewing all the evidence, the Court notes that there is no independent evidence to corroborate Brinkley's testimony. Adams's and Salo's assurances that they were not being paid by Williamson during the conflict of interest is not necessarily independent evidence corroborating Brinkley's testimony. Nor is Harris's statement that an insurance settlement was used to pay his fees. The Court is reluctant to conclude that the evidence presented demonstrates a conspiracy to procure the silence of Reginald Harris or to conceal who was paying his legal fees. Consequently, since the government has not established the first prong under the co-conspirator exception, Salo's statements are inadmissible.

## IV. WAIVER OF CONFRONTATION RIGHT

In *United States v. Thevis* the Eleventh Circuit held that in order to show that a defendant has waived his confrontation right the government must prove, by clear and convincing evidence, that (1) the defendant caused a witness to be unavailable (2) for the purpose of preventing the witness from testifying at trial. 665 F.2d 616, 633 n. 17 (1982). This Court concludes that the government has not carried its burden because it failed to present clear and convincing evidence on the causation and purpose issues.

Even if Williamson paid Harris's attorneys the government failed to establish that he caused Harris to be unavailable for the purpose of silencing him. For the government to establish that Williamson waived his confrontation right, it would either have to demonstrate an agreement between Harris and Williamson that Williamson would pay Harris's legal fees if Harris remained silent or a conspiracy to keep Harris from testifying involving Williamson, Adams, and Salo.

First, the prosecution failed to establish that Williamson caused Harris to remain silent by agreeing to pay his legal fees in return for Harris's silence. The only evidence the government presented that Williamson instructed Harris to remain silent was Harris's testimony that the first time he saw Williamson after he was arrested, Williamson said "... just hang in there, don't say nothing. If it takes my very last dime I'm going to get you out." (R. 16). The government argues that this statement demonstrates that Williamson procured Harris's silence. The statement may be interpreted in different ways. On one hand, it is the kind of common sense advice and support one conspirator would give to a recently arrested co-conspirator. On the other hand it may be interpreted to mean "don't implicate me". The statement is not clear and convincing evidence precisely because it can be interpreted either way.

Furthermore, Harris would have to know that Williamson was paying his fees before there could be a conspiracy to procure his silence. If Harris did not know that Williamson was paying his legal fees when he invoked his Fifth Amendment right then there is no evidence that Williamson's alleged promise caused Harris to be unavailable. Harris's testimony on this point was confusing and contradictory. Harris testified that he thought Williamson would keep his promise to help him. (R. 16). At the conflict of interest hearing, however, Harris testified he was using an insurance settlement to pay his fees. (Conflict of Interest Hearing at 6). When asked whether he lied at the conflict hearing Harris initially admitted that he lied and then

changed his answer and said that he was not lying because he only stated what he had been told by his mother. (R. 30, 33). Ms. Brinkley testified that Williamson instructed her not to tell Harris that he was paying his legal fees, (R. 62), and that Harris did not know that Williamson was paying his fees at the time of the conflict of interest hearing. (R. 72). The evidence is unclear as to precisely when Harris learned that Williamson was paying his legal fees. Therefore, the Court finds that the government did not show that Williamson and Harris agreed that Harris would remain silent in exchange for the payment of his legal fees by clear and convincing evidence.

In the alternative, the government argues that Williamson and his attorneys caused Harris to be unavailable for the purpose of preventing him from testifying at trial. The government asserts that Williamson paid Harris's legal fees and that Adams and Salo did everything they could do as attorneys to prevent Harris from testifying by advising him to remain silent and refusing to help him cooperate with the government. Admittedly, Adams and Salo caused Harris to be unavailable by advising him to invoke his Fifth Amendment privilege. The government, however, did not offer any direct evidence that Williamson instructed Salo and Adams to keep Harris from testifying. Although Brinkley testified that Adams asked her to leave his office while he met with the Defendant and Carlton Williamson, there was no testimony concerning what happened during the meeting. Thus, the question is whether Adams and Salo advised Harris to invoke his right to remain silent for the purpose of preventing him from testifying at trial.

At the time Harris was advised to remain silent, he had an appeal on a fourth amendment issue pending before the Eleventh Circuit. If he prevailed on his appeal then all the evidence against him would have been suppressed. Had Harris made any inculpatory statements before his appeal was decided, he would have destroyed any benefit gained by a reversal. Given that situation, this Court is unwilling to conclude that the attorneys' advice was an effort to keep Harris from testifying against Williamson.

In addition to advising him to remain silent, Harris testified that when he told Ed Adams he wanted to cooperate, Adams refused to contact the government. Harris indicated that this conversation occurred during the pendency of his appeal. While the refusal might be evidence of an effort to protect Williamson, the Court, as discussed below, does not view this testimony to be compelling in light of its reservations concerning Harris's credibility.

In addition to the above discussion, the Court found both government witnesses' testimony to be biased and contradictory. The Court previously has discussed inconsistent portions of Harris's testimony. Harris also admitted that he lied to DEA agents and police officers after he was arrested, (R. 41), and that part of the reason he was testifying at the evidentiary hearing was to get "one last chance at freedom." (R. 42). If Harris had the motive to respond untruthfully before he was convicted, his motivation can only have increased now that he is in prison. Thus, given his motivation to obtain a sentence reduction, and his willingness to be untruthful on other occasions, the Court does not view Harris as a credible witness. Furthermore, this Court does not find Ms. Brinkley to be a credible witness.

Ms. Brinkley admitted she lied to her son when she told him money from his personal injury settlement was being used to pay his attorneys' fees. She also conceded she knew that her son was misleading this Court at the conflict hearing, yet she did nothing. (R. 73, 74). Thus, Brinkley has shown that she is not averse to dishonesty if it helps her son. Moreover, Brinkley blames Fredel Williamson for her son's current predicament. She testified that although she cannot say that Williamson is responsible, he should have gotten someone else to drive the drugs home. (R. 81).

Accordingly, given the witnesses' lack of credibility and the government's failure to present clear and convincing evidence on the causation and purpose issues, this

Court concludes that the government has not shown that Fredel Williamson caused Reginald Harris to be unavailable for the purpose of testifying at trial.

SO ORDERED.