OPINION.
{¶ 1} The State of Ohio appeals from a judgment of the Clark County Municipal Court, which granted Matthew Brocious's motion to dismiss the charges against him.
 {¶ 2} On November 23, 2002, Sheriff Deputy Matthew Brocious reported to the scene of an automobile accident. While Deputy Brocious was measuring skid marks pursuant to his investigation of the accident, Captain Jim Steggeman from the fire department arrived and parked his fire engine over the skid marks. Versions of events differ from this point regarding the behavior of Deputy Brocious and Captain Steggeman. Essentially, however, Deputy Brocious ordered Captain Steggeman to move the fire engine. While getting back into the vehicle to do so, Captain Steggeman referred to Deputy Brocious as an "asshole." This led to Deputy Brocious's pulling his gun on Captain Steggeman, handcuffing him, and placing him under arrest in the back of the cruiser.
 {¶ 3} After Deputy Brocious arrested Captain Steggeman, Deputy Brocious's superior, Sergeant Dan Loney, arrived. Sergeant Loney spoke to the chief of the fire department and to Deputy Brocious. He then ordered Deputy Brocious to return to headquarters and to remain there until Sergeant Loney arrived. He further ordered Deputy Brocious to prepare a statement regarding the incident. Sergeant Loney remained at the scene, where he spoke to witnesses and took an employee misconduct statement regarding Deputy Brocious. Sergeant Loney also notified his superior, Lieutenant Russell Garman, of the incident.
 {¶ 4} Lieutenant Garman was in the process of reporting to the scene when his superior, Captain Carl Loney, ordered him to report to headquarters and question Deputy Brocious. Captain Loney made the decision to begin a formal investigation and ordered Lieutenant Garman to give Deputy Brocious warnings pursuant to Garrity v. State of New Jersey
(1967), 385 U.S. 493, 87 S.Ct. 616, and to order him to answer questions. This decision was contrary to normal procedure, which required that a period of 24 hours pass prior to the questioning of a deputy in a case involving possible criminal charges. Nevertheless, Lieutenant Garman proceeded to headquarters, where he found Deputy Brocious in the process of writing a statement as directed by Sergeant Loney. Deputy Brocious was being monitored by a supervisor at the jail pursuant to an order by Sergeant Loney. When Lieutenant Garman arrived, he took Deputy Brocious to another room and had him sign a document that included the following language: "I, Matt Brocious understand: * * * That I am granted immunity and that neither my statements, nor any information or evidence gained by reason of this interview, including the results of the polygraph examination, can be used against me in any subsequent criminal proceedings." Deputy Brocious requested a union representative and, after the union representative arrived, the Garrity warnings were reiterated. Lieutenant Garman then interviewed Deputy Brocious regarding the incident with Captain Steggeman. Following the interview, Lieutenant Garman asked Deputy Brocious for the statement that he had prepared. They returned to the room in which Deputy Brocious had written the statement and saved it to a disc on the laptop computer issued to him by the department. The union representative testified that Deputy Brocious had indicated to Lieutenant Garman that he had not finished the statement and that Lieutenant Garman had stated that he would take it as it was; however, Lieutenant Garman could not remember whether Deputy Brocious had finished the statement or not. In any case, Lieutenant Garman collected the unsigned statement and the disc upon which it was saved, and they were included in the internal investigation file.
 {¶ 5} On January 16, 2002, the Springfield City Prosecutor requested that a special prosecutor, Riverside City Prosecutor Susan Brasier, be appointed to review the case for possible criminal charges. She was given a packet of materials, which included the statement typed by Deputy Brocious. Based upon her review of the packet of information, Deputy Brocious was charged with Aggravated Menacing and Misconduct at an Emergency on January 29, 2002. On April 29, 2002, Deputy Brocious filed a motion to dismiss the charges based upon the prosecutor's use of his immunized statement. A hearing was held on May 22, 2002, and the trial court granted the motion to dismiss on October 10, 2002. In granting Deputy Brocious's motion to dismiss, the trial court concluded that Deputy Brocious's typed statement had been made voluntarily but that it had been immunized during Lieutenant Garman's interview. The trial court further concluded that the prosecutor had failed to establish (1) that she had not made any use of the immunized testimony and (2) that the evidence to be presented at trial was derived from sources wholly independent of the statement.
 {¶ 6} The state appeals, raising one assignment of error.
 {¶ 7} "The Trial Court Erred In Finding That The Invocation Of Garrity Warnings After A Defendant Has Made A Voluntary Statement Required The Dismissal Of The Criminal Charges Against A Sheriff's Deputy."
 {¶ 8} The state argues that the trial court erred in concluding that Deputy Brocious's typed statement was an immunized statement and that the prosecutor improperly used Deputy Brocious's immunized statement.
 {¶ 9} In Garrity v. State of New Jersey (1967), 385 U.S. 493,87 S.Ct. 616, the United States Supreme Court held that confessions made by police officers were not voluntary where the police officers were given the choice between incriminating themselves or forfeiting their jobs and pensions. The police officers were effectively coerced into making the incriminating statements, and their confessions could therefore not be used against them in criminal proceedings. Id. at 497-98,87 S.Ct. at 618-19. The Court later held, however, that a public employee can be required to answer incriminating questions, and even threatened with job loss if he does not comply, so long as the employee is advised that his statements cannot be used against him in a subsequent criminal proceeding. See, e.g., Gardner v. Broderick (1968), 392 U.S. 273, 276,88 S.Ct. 1913, 1915. See, also, Jones v. Franklin Cty. Sheriff (1990),52 Ohio St.3d 40, 44, 555 N.E.2d 940.
 {¶ 10} Based upon these cases, the Supreme Court of Ohio has held that, in investigating police officers for the purpose of internal discipline, an internal affairs division is empowered to fire an officer who refuses to answer questions following an advisement that the answers will not be used in a subsequent criminal proceeding. See Jones, supra. The state argues that Jones is inapplicable to this case because it involved a civil suit brought by a police officer who had been terminated for refusing to answer questions in connection with an internal investigation after she had been advised that her answers would not be used against her in a subsequent criminal proceeding. In upholding her termination, the supreme court concluded that an internal affairs division has the power to effectively immunize statements made by a police officer in the context of an internal investigation. Id. at 44. The court noted: "[T]he [Internal Affairs Division], within clearly defined constitutional parameters, must be given latitude to conduct investigations to ensure the continued integrity of the department. It is critical to any meaningful IAD investigation that, once officers have been assured that their constitutional guarantees remain intact, they are required to respond to specific questions dealing with job performance. Without such a mandate, the IAD cannot ensure the integrity and trustworthiness of the department officers and the public cannot be assured of the propriety of placing its trust in these public servants." Id. While, as the state argues, this case has been criticized for giving police officers the power to protect each other from criminal prosecution, see, e.g., Jones, supra, at 49, 55 (Douglas, J., dissenting); State v. Sess (1999), 136 Ohio App.3d 689, 694-95,737 N.E.2d 969 (Painter, J., dissenting), it is the law in Ohio, and we must follow it. We see no pertinent distinction between Jones and this case. Therefore, we conclude that Lieutenant Garman, pursuant to an order from Captain Loney, had the authority to grant Deputy Brocious immunity from the use of his statements in a subsequent criminal proceeding in order to compel him to answer questions for the purpose of an internal investigation.
 {¶ 11} Having determined that Lieutenant Garman had authority to grant Deputy Brocious immunity from the use of his statements in a subsequent criminal proceeding against him, we must now determine whether Lieutenant Garman did so with respect to Deputy Brocious's typed statement. Prior to interviewing Deputy Brocious, Lieutenant Garman had him sign a form, which described his rights and provided: "I, Matt Brocious understand: * * * That I am granted immunity and that neither my statements, nor any information or evidence gained by reason of this interview, including the results of the polygraph examination, can be used against me in any subsequent criminal proceedings." There is no question, and the state does not dispute, that this form granted Deputy Brocious immunity from the use of statements he made during his interview with Lieutenant Garman in a subsequent criminal proceeding against him. What is in dispute is whether this statement granted him immunity over the use of his typed statement.
 {¶ 12} The state argues that Deputy Brocious's typed statement was made voluntarily before the administering of Garrity warnings and therefore was not covered by the grant of immunity. Deputy Brocious argues that the statement was covered by the grant of immunity because he was under investigation at the time it was made and because he did not give the statement to Lieutenant Garman until after he had been given hisGarrity warnings, and therefore after the grant of immunity. The trial court concluded that the internal investigation of Deputy Brocious began when Captain Loney instructed Lieutenant Garman to give Deputy Brocious his Garrity warnings and interview him about the incident with Captain Steggeman. The court further noted that the typed statement was not given to Lieutenant Garman until after Deputy Brocious had been given hisGarrity warnings two times and had been interviewed. Furthermore, Lieutenant Garman testified that he had believed that the statement would be used in the internal investigation and had, in fact, turned the statement over to internal affairs where it was made a part of the file. Based upon these facts, the trial court concluded that the statement was covered by the grant of immunity. We agree. Although the state stresses that Deputy Brocious wrote his statement prior to the administering ofGarrity warnings, we note that it is unclear from the record whether Deputy Brocious had completed his statement prior to Lieutenant Garman's collecting it. Furthermore, he did not give it to Lieutenant Garman until he was told to do so after the interview. The Garrity warnings on their face granted Deputy Brocious immunity for this statement. Therefore, we conclude that the trial court properly determined that the immunity granted to Deputy Brocious covered the typed statement.
 {¶ 13} The Supreme Court of Ohio has addressed the use of immunized statements by a prosecutor. In State v. Conrad (1990),50 Ohio St.3d 1, 4, 552 N.E.2d 214, the supreme court adopted a two-part test set forth in Kastigar v. United States (1972), 406 U.S. 441,460-62, 92 S.Ct. 1653, 1664-66. Under that test, "where a witness makes the claim that his or her immunized testimony was used: (1) the government must deny any use of the accused's own immunized testimony against him or her in a criminal case; and (2) the government must affirmatively prove that all of the evidence to be used at trial is derived from sources wholly independent of immunized testimony." (Emphasis sic.) Conrad, supra, at 4. In Conrad, the supreme court concluded that, where a prosecutor used the immunized testimony of a witness to formulate questions before a grand jury and to impeach the witness's testimony, the prosecutor had improperly used the immunized testimony in violation of Kastigar. Id. at 4-5. The court further held that this use of an immunized statement, although minimal and unlikely to have actually prejudiced the defendant, was not harmless error. Id. at 5. While we note that, as the state argues, both Conrad and Kastigar
involved immunity granted pursuant to statute, see R.C. 101.44 and Section 6002, Title 18, U.S. Code, we see no meaningful distinction between use immunity granted pursuant to statute and use immunity granted pursuant to an internal investigation of a public official under Jones. Furthermore, contrary to the state's assertion, the test set forth inKastigar has been applied in the context of Garrity immunity by federal courts. See, e.g., United States v. Daniels (C.A. 5, 2002), 281 F.3d 168,180-81; United States v. Vangates (C.A. 11, 2002), 287 F.3d 1315, 1319, fn. 4 (noting that "because Garrity protection is `tantamount to use immunity,'" the Kastigar analysis applies to Garrity protection). We therefore must follow Conrad and Kastigar in determining whether the trial court correctly determined that the state failed to establish that the special prosecutor did not improperly use Deputy Brocious's statement.
 {¶ 14} We note that Conrad and Kastigar specifically prohibit any
use by the prosecutor of a witness's immunized statement. Furthermore, the burden is upon the state to establish that no use was made of the immunized statement and that the evidence to be used at trial was derived from sources wholly independent of the immunized statement. However, federal courts are split regarding whether non-evidentiary uses, such as informing the decision to prosecute or interpreting other evidence, are prohibited by the language in Kastigar. Compare United States v. McDaniel
(C.A. 8, 1973), 482 F.2d 305, 311 (vacating conviction where prosecutor had inadvertently reviewed immunized testimony prior to charging defendant and stating that such a case presented "an insurmountable task in discharging the heavy burden of proof imposed by Kastigar") and UnitedStates v. Semkiw, 712 F.2d 891 (C.A. 3, 1983) with U.S. v. Byrd (C.A. 11, 1985), 765 F.2d 1524, 1530-31 (declining to follow McDaniel and holding that Kastigar prohibits only the evidentiary use of immunized statements). The trial court concluded that the language of Conrad
implicitly adopted the McDaniel approach, prohibiting non-evidentiary uses of immunized statements, such as informing the decision to prosecute. We agree with the trial court that this is the better approach given the prohibitory language of Conrad.
 {¶ 15} In this case, the trial court concluded that the state did not deny having used Deputy Brocious's statement in determining whether to bring charges against him. On the contrary, the testimony by the prosecutor indicated that she had read witness statements and interviewed witnesses and that she had read Deputy Brocious's statement and determined that it corroborated the witness statements. At the least, the prosecutor made use of Deputy Brocious's statement in solidifying her decision to charge him. She was furthermore specifically asked if she had told the trial court and the defense attorney that she had decided to bring two charges against Deputy Brocious based upon her review of his statement. Her answer was that she did not know whether she had said it. Also problematic is the lack of testimony regarding the sources of the evidence to be used at trial. The prosecutor could not remember whether she had read Deputy Brocious's statement before or after she had finished interviewing witnesses, and there is no testimony regarding the evidence that she intended to use at trial. Based upon these factors, the trial court determined that the state had not met its burden under Kastigar andConrad.
 {¶ 16} We agree with the trial court. While we do not necessarily agree with the McDaniel court's conclusion that the government is faced with an "insurmountable task" in meeting the Kastigar test in this situation, the evidence presented at the hearing on the motion to dismiss did not establish that the prosecutor made no use of Brocious's immunized statement or that the evidence to be used at trial was derived from wholly independent sources. Because the burden is on the state to establish that no improper use was made of the statement, we must conclude that the trial court properly found that the state did not meet its burden. Pursuant to Conrad, the appropriate sanction for improper use of an immunized statement is dismissal of the indictment: "Since improper use of immunized testimony by the prosecution under Kastigar should never be countenanced, dismissal of the indictment will greatly discourage such abuse by prosecuting authorities in future cases." Conrad, supra, at 5. While there is some confusion among courts regarding the appropriate remedy where the immunized statement was also coerced, see Sess, supra, at 692-93 (deciding the case on the basis that the testimony was coerced and holding that suppression was the appropriate remedy), no such confusion exists in this case. Therefore, we hold that, pursuant toConrad, dismissal of the complaint is the appropriate remedy, and the trial court did not err in dismissing the complaint against Deputy Brocious.
 {¶ 17} The state's assignment of error is overruled.
 {¶ 18} The judgment of the trial court will be affirmed.
GRADY, J., concurs.