OPINION
{¶ 1} Todd Mitchell ("Mitchell") appeals the April 11, 2003 judgment entry of the Geauga County Court of Common Pleas affirming the Bainbridge Township Board of Trustees' ("Board") decision to remove Mitchell as a Bainbridge Township police officer. For the reasons set forth below, we affirm the decision of the trial court in this matter.
 {¶ 2} Mitchell was hired as a Bainbridge Township police officer in 1999. Sometime in 2000, Mitchell secretly taped a conversation with Sergeant Jack Silvis ("Sgt. Silvis").
 {¶ 3} On May 16, 2001, Mitchell engaged in conversation with Officer Jon Weiner ("Officer Weiner") at the desk of Detective Robert Weir ("Det. Weir"). Mitchell inquired about a drug case that Officer Weiner was working on at the time. At some point, Officer Weiner returned a key that fit a lock to a drawer in Det. Weir's desk, which could contain money for drug buys, evidence and/or confidential information regarding informants, to the sergeants' office across the hall. After returning the key and upon exiting the office, Officer Weiner ran into Mitchell in the hallway outside the office.
 {¶ 4} On Monday, May 21, 2001, Det. Weir returned to work and discovered the drawer in his desk unlocked and the key from the sergeants' office stuck in the lock. The key was bent and required some measure of force to remove it. After determining that no one with authority to enter the desk was responsible for the incident, Lieutenant Jon Bokovitz ("Lt. Bokovitz") and Sergeant Andy Kelley ("Sgt. Kelley") conducted interviews of all people, including non-police personnel, that had access to the desk over the weekend preceding Det. Weir's discovery. Everyone who was interviewed denied any involvement or knowledge of the incident.
 {¶ 5} On May 25, 2001, Chief James Jimison ("Chief Jimison") conducted a meeting with all officers. At this meeting, Chief Jimison stated that if no one came forward by May 29, 2001, he would have individuals undergo a polygraph examination. Since no one came forward with any details about the incident, Chief Jimison arranged to have Michael LoPresti ("LoPresti"), a polygraphist with the Ohio Bureau of Criminal Identification and Investigation ("BCI"), conduct the examinations. LoPresti informed Chief Jimison that he would only be able to conduct nine polygraph examinations. Chief Jimison told Lt. Bokovitz to choose the nine individuals to undergo the examinations. Lt. Bokovitz choose eight officers who had the most access over the weekend before the discovery, including Mitchell, and the cleaning lady.
 {¶ 6} Mitchell's polygraph examination took place on June 20, 2001, at BCI. LoPresti conducted a pre-interview of each of the examinees. During the pre-interview he asked each examinee, among other things, if they suspected anyone in the incident and if they knew of other incidents where a fellow officer did something improper. Mitchell denied any knowledge in response to these inquiries.
 {¶ 7} After conducting the pre-interview, LoPresti, utilizing the Arthur technique, conducted the polygraph examination. As part of this technique, LoPresti asked each of the examinees the following questions three times, twice in the same order and once in a different order:
 {¶ 8} "[1.] Do you live in the United States?
 {¶ 9} "[2.] To learn the identity of confidential informants, did you open Det. Weir's desk drawer?
 {¶ 10} "[3.] Do you know for sure who unlocked Det. Weir's desk drawer?
 {¶ 11} "[4.] Did you unlock Det. Weir's desk drawer?
 {¶ 12} "[5.] Besides what you told me, can you now remember ever committing even one other specific crime?
 {¶ 13} "[6.] Did you remove Det. Weir's desk key from the lieutenant's office?
 {¶ 14} "[7.] So you could sell information about drug activity, did you open Det. Weir's desk drawer?
 {¶ 15} "[8.] Did you get that key stuck in Det. Weir's desk drawer?
 {¶ 16} "[9.] Besides what you told me, can you now remember ever telling even one other specific lie?
 {¶ 17} "[10.] Do you live in Canada?"
 {¶ 18} LoPresti found that Mitchell was deceptive while the other eight individuals were not deceptive. LoPresti determined that Mitchell's results had a probability of deception greater than 99 percent. Specifically, Mitchell exhibited consistent deception to the questions "Do you know for sure who unlocked Det. Weir's desk drawer?" and "Did you get that key stuck in Det. Weir's desk drawer?" LoPresti sought a second opinion on Mitchell's results, which affirmed LoPresti's conclusion that Mitchell was deceptive.
 {¶ 19} Soon thereafter, LoPresti informed Chief Jimison of Mitchell's results. After being informed of the results, Chief Jimison sent Det. Kelley and Lt. Bokovitz to one of Mitchell's former employers as part of the in-depth investigation of Mitchell, wherein they interviewed George Alaimo. While no other possible suspect was subject to such an in-depth investigation, this in-depth investigation of Mitchell was warranted because Mitchell had failed his polygraph.
 {¶ 20} At a June 27, 2001 meeting with Mitchell, Chief Jimison and Lt. Bokovitz informed Mitchell of the results of his polygraph. Prior to the interview, Mitchell waived his Garrity rights. Chief Jimison asked Mitchell if he had a tape recorder on him and whether he was recording the meeting. Mitchell acknowledged that he was taping the meeting. Chief Jimison then instructed Mitchell to place the recording device on the table. In response to inquiries from Chief Jimison, Mitchell denied any involvement with the drawer incident. Mitchell then informed Chief Jimison that he did not want to speak without the presence of an attorney. Thus, the meeting was terminated.
 {¶ 21} Another meeting was held on July 6, 2001. At this meeting, Mitchell was represented by counsel. Mitchell, again, denied any involvement with the drawer incident. Mitchell also denied ever secretly recording any conversations with other officers or officials.
 {¶ 22} On July 18, 2001, Mitchell hired a second polygraphist, Edward Favre ("Favre"), to conduct another examination. In the pre-interview, Mitchell acknowledged that he was not truthful in responding to questions during the pre-interview that occurred prior to the first polygraph examination. Although Favre utilized a different technique in administering the examination, the questions asked were similar in nature. Moreover, the two questions to which Mitchell exhibited consistent deception in the first examination were repeated verbatim in this examination. Favre determined that Mitchell had "no reactions indicative of deception." Favre sought a second opinion from Richard Stimson ("Stimson"), who concurred with Favre's conclusion.
 {¶ 23} Around this same time, both parties discussed having Mitchell take a second polygraph. On July 25, 2001, a week after Mitchell's examination with Favre, Mitchell sent a list of acceptable polygraphists to James Budzik ("Budzik"), attorney for Bainbridge Township. That list contained three names, including Favre and Stimson. After contacting Favre in order to set up the second examination and upon being informed by Favre that he had already conducted an examination of Mitchell, Budzik informed Mitchell that a second polygraph would not be conducted.
 {¶ 24} On August 22, 2001, Mitchell received a notice of a pre-disciplinary meeting scheduled on August 27, 2001. On August 24, 2001, Mitchell waived the pre-disciplinary meeting.
 {¶ 25} On September 28, 2001, Chief Jimison recommended to the Board that Mitchell be terminated or be placed on long-term suspension. On October 5, 2001, Mitchell received a notice of charges and a notice of hearing date. The hearing was initially set for October 15, 2001. The October 15, 2001 hearing was subsequently continued. Mitchell was charged as follows:
 {¶ 26} "1. On or about the weekend of May 18, 2001, you removed, without proper authorization, a key from the Lieutenant's desk and entered Detective Robert Weir's office and unlocked a drawer which contained confidential information and money. In doing so, the key became lodged in the lock, which required the repair of the lock.
 {¶ 27} "2. You were interviewed on June 27, 2001 and attempted to secretly tape-record the Chief of Police and the Police Lieutenant during the interview. You previously, during the summer of 2000, secretly tape-recorded a sergeant regarding another disciplinary matter.
 {¶ 28} "3. On or about July 6, 2001 while being interviewed, and in the presence of your counsel, you made misrepresentations and fabrications in response to Chief Jimison's questioning regarding your actions on the weekend of May 18, 2001, your tape-recording of other police supervisors and you otherwise hindered a lawful internal investigation."
 {¶ 29} On October 15, 2001, the charges were amended to add the following charge:
 {¶ 30} "You participated in an internal investigation on June 18, 2001 which included a polygraph examination. During such internal interview and polygraph examination you lied and made misrepresentations to the polygrapher (sic). On July 18, 2001 you, at your discretion were interviewed by Polygrapher (sic) Edward Favre. At that interview, you admitted that you lied and made misrepresentations during your first polygraph examination (internal examination) conducted by Michael LoPresti."
 {¶ 31} A two-day disciplinary hearing commenced on November 5, 2001. On March 27, 2002, the Board found "that the charges against Mitchell have merit; that the conduct of the accused, as alleged in the charges, occurred; that Mitchell is guilty of the conduct alleged in the charges; that the recommendation of the Chief concerning termination of the accused Mitchell be adopted; and that Todd Mitchell should be and is hereby terminated from his employment and dismissed from his position."
 {¶ 32} Mitchell timely appealed the Board's decision to the Geauga County Court of Common Pleas. The trial court found that, under the standard of review to which it is confined, Mitchell was properly removed from his position. Thus, on April 11, 2003, the court affirmed the Board's decision.
 {¶ 33} Mitchell timely appealed this decision and raises the following assignment of error:
 {¶ 34} "The trial judge erred by refusing to find that the termination of plaintiff-appellant's employment as a police officer was unconstitutional, illegal, arbitrary, capricious, unreasonable, and unsupported by the preponderance of the evidence."
 {¶ 35} In his sole assignment of error, Mitchell argues that he was denied his procedural due process rights because the Board failed to follow the "established system of progressive discipline." Mitchell also argues that the Board's decision is "contrary to the preponderance of the more credible evidence."
 {¶ 36} Although Mitchell also argues that the Board and the trial court should have examined the implications of Mitchell's involvement in trying to organize a union for Bainbridge Township police officers, there was no evidence introduced to demonstrate that any superior officer had knowledge of the union activity. In addition, Mitchell was the only witness to testify regarding Chief Jimison's and Lt. Bokovitz's purported anti-union sentiments. Mitchell self-servingly testified that he heard about Chief Jimison's and Lt. Bokovitz's anti-union stance from one officer who worked at the Bainbridge Township Police Department 15 to 20 years prior to this incident. Since that former officer did not testify, the only evidence in the record is Mitchell's hearsay testimony. Mitchell did not testify to any matter, other than his own "general perceptions," that he personally experienced that would lend credence to his claim. Moreover, Mitchell testified that he did not feel that he was being singled out in the investigation of the drawer incident. We, therefore, agree with the trial court that this issue is irrelevant.
 {¶ 37} A patrol officer is subject to termination "if the board of trustees of a township has reason to believe that [the] * * * patrol officer * * * has been guilty, in the performance of the official duty of that * * * patrol officer, * * * of bribery, misfeasance, malfeasance, nonfeasance, misconduct in office, neglect of duty, gross immorality, habitual drunkenness, incompetence, or failure to obey orders given that person by the proper authority." R.C. 505.491. In terminating a patrol officer, a board of trustees must follow "the procedures in sections505.491 to 505.495 of the Revised Code," R.C. 505.49(B)(3), which includes the filing of written charges, see R.C. 505.491, and conducting a hearing at the next regular meeting of the board of trustees. See R.C. 505.492; see, also, Smith v. Fryfogle
(1982), 70 Ohio St.2d 58, 60 ("In those limited circumstances where the trustees believe the * * * patrolman * * * has been guilty of one of the named offenses the trustees must act in a quasi-judicial manner, conducting a due process hearing.").
 {¶ 38} The Bainbridge Township Police Department Disciplinary Policy ("Disciplinary Policy") provided for "an established system of progressive discipline" with three classes of offenses, which classification depended on the nature of the offense and the disruption caused by the infraction. The Disciplinary Policy also provided that "[d]iscipline shall usually be progressive, but depending on the severity of the offense, may proceed immediately to termination." Moreover, the Disciplinary Policy reserved "the right to fashion appropriate discipline for any infraction not specifically set forth" in the Disciplinary Policy. The Disciplinary Policy also provided for a pre-disciplinary hearing.
 {¶ 39} In this case, since the charges filed against Mitchell were not specifically set forth in the Disciplinary Policy, the Board had the right to fashion an appropriate discipline for Mitchell's offenses, pursuant to the Disciplinary Policy. Further, even if the charges were specifically set forth in the Disciplinary Policy, the severity of the offenses, as discussed below, involving the integrity of a law enforcement officer, permitted the immediate termination of Mitchell. Thus, since Mitchell waived the pre-disciplinary hearing and since the Board followed the requisite procedures of R.C. 505.491 to R.C.505.495, Mitchell was provided his due process rights. See In reMyles (Dec. 14, 1987), 2nd Dist. No. 10401, 1987 Ohio App. LEXIS 10120, at *22 (citation omitted) (an officer's due process rights were not violated where the officer received notice of the charges and had an opportunity to be heard at a meaningful time and in a meaningful manner).
 {¶ 40} In an administrative appeal, the court of common pleas "may reverse the board if it finds that the board's decision is not supported by a preponderance of reliable, probative and substantial evidence. An appeal to the court of appeals, pursuant to R.C. 2506.04, is more limited in scope and requires that court to affirm the common pleas court, unless the court of appeals finds, as a matter of law, that the decision of the common pleas court is not supported by a preponderance of reliable, probative and substantial evidence." Kisil v. Sandusky (1984),12 Ohio St.3d 30, 34. "It is incumbent on the trial court to examine the evidence. Such is not the charge of the appellate court. The appellate court is to determine only if the trial court has abused its discretion." Lorain City School Dist. Bd. of Edn. v.State Emp. Relations Bd. (1988), 40 Ohio St.3d 257, 261. In so determining, we must remain cognizant of the fact that the trial court "must give due deference to the administrative resolution of evidentiary conflicts." Kisil, 12 Ohio St.3d at 35, quotingUniv. of Cincinnati v. Conrad (1980), 63 Ohio St.2d 108, 111.
{¶ 41} An abuse of discretion consists of more than an errorof law or judgment. Rather, it implies that the court's attitudeis unreasonable, arbitrary or unconscionable. Berk v. Matthews(1990), 53 Ohio St.3d 161, 169 (citation omitted). Reversal,under an abuse of discretion standard, is not warranted merelybecause appellate judges disagree with the trial judge or believethe trial judge erred. Id. Reversal is appropriate only if theabuse of discretion renders "the result * * * palpably andgrossly violative of fact and logic [so] that it evidences notthe exercise of will but perversity of will, not the exercise ofjudgment but defiance thereof, not the exercise of reason butrather of passion or bias." State v. Jenkins (1984),15 Ohio St.3d 164, 222 (citation omitted).
 {¶ 42} In this case, there was extensive evidence submitted atthe disciplinary hearing to establish each of the charges filedagainst Mitchell. In regards to the charge that Mitchell secretlytape-recorded a conversation with a superior officer and thatMitchell attempted to secretly tape-record his June 27, 2001meeting with Chief Jimison and Lt. Bokovitz, Mitchell admitted tothese facts at the hearing. Moreover, Officer Christopher Smithtestified that Mitchell acknowledged that Mitchell recorded asuperior officer in 2000, while Chief Jimison and Lt. Bokovitztestified regarding Mitchell's attempt to secretly record theJune 27, 2001 meeting. While there was evidence that numerousofficers utilized hidden tape recorders, the evidencedemonstrated that the hidden tape recorders were used to protectthe officer out in the field, rather than to record fellowofficers.
 {¶ 43} Regarding the two charges concerning Mitchell'sfalsehoods and misrepresentations, i.e. denying he ever secretlytape-recorded another officer and lying during his initialpolygraph examination, which was part of an official internalinvestigation, Mitchell also admitted to these facts. Inaddition, Favre testified that Mitchell informed him that he hadlied during the first polygraph examination, which fact was alsoexhibited in Favre's report. If Mitchell were to maintain hisposition with the Bainbridge Township Police Department, theexistence of these multiple falsehoods and misrepresentationswould cause serious repercussions on any future prosecutionsrequiring Mitchell to testify, see Giglio v. United States(1972), 405 U.S. 150, 154 (citation omitted) ("[w]hen the`reliability of a given witness may well be determinative ofguilt of innocence,' nondisclosure of evidence affectingcredibility" would justify a new trial), which clearlydemonstrates the severe nature and the critical disruption thatthese multiple falsehoods and misrepresentations present.
 {¶ 44} As to the drawer incident, the preponderance of reliable, probative and substantial evidence supports the trialcourt's decision. The evidence introduced at the hearingdemonstrated that Mitchell was in the vicinity of the desk justdays before the incident asking questions regarding a drug case.The evidence also indicated that, while the location of the keywas not generally known, Mitchell had the opportunity to observeOfficer Weiner replace the key in the office where it was kept.There was also testimony that Mitchell had a reputation at aprevious employer for "going through people's desk." Further, Lt.Bokovitz testified that, during the June 27, 2001 meetingregarding the incident, Mitchell exhibited extremely nervousbehavior. Lt. Bokovitz also testified that after Mitchell hadtaken the initial polygraph examination, but prior to obtainingthe results, he noticed Mitchell walking around the hallwayoutside of his office, activity that Lt. Bokovitz had notobserved prior to the incident. Finally, the evidencedemonstrates that Mitchell exhibited a probability of deception greater than 99 percent during the initial polygraph examination.
 {¶ 45} Mitchell denied any involvement with the drawer incident. Mitchell also proffered evidence that he did not demonstrate deception in a subsequent polygraph examination. However, there was evidence introduced that the results of a second examination that utilizes the same questions, as was done in this case, could affect the results of the second examination. Moreover, there was also testimony introduced that, when there exists conflicting polygraph results, the results of the first examination "would absolutely be more accurate." Although Mitchell introduced conflicting evidence, resolving conflicts in the evidence is within the purview of the administrative board. See Kisil, 12 Ohio St.3d at 35 (citation omitted) (the trial court "must give due deference to the administrative resolution of evidentiary conflicts"); see, also, Shull v. Itani, 11th Dist. No. 2002-L-163, 2004-Ohio-1155, at ¶ 36 (citations omitted) ("Where both parties present conflicting expert testimony, we are loathe to substitute our judgment regarding the credibility and persuasiveness of the evidence for that of the trier of fact.").
 {¶ 46} We, therefore, find that the trial court did not abuse its discretion in affirming the decision of the Board. See Jonesv. Franklin Cty. Sheriff (1990), 52 Ohio St.3d 40, 43-45
(affirming the officer's dismissal for her insubordination in failing to respond to questions during an internal investigation); Myles, 1987 Ohio App. LEXIS 10120, at *23 (upholding the officer's termination for "serious" offenses, which included numerous instances of lying); Hobbie v. Medina
(1985), 29 Ohio App.3d 306, 308-309 (affirming the officer's discharge for insubordination and refusing to cooperate during an internal investigation).
 {¶ 47} For the foregoing reasons, we hold that Mitchell's assignment of error is without merit. The decision of the Geauga County Court of Common pleas is affirmed.
Christley, J., concurs.
O'Neill, J., dissents with a Dissenting Opinion.